NESTLE HOLDINGS, INC., ON BEHALF OF ITSELF AND CONSOLIDATED SUBSIDIARIES, AND AS THE SUCCESSOR IN INTEREST TO NESTLE ENTERPRISES, INC. AND CONSOLIDATED SUBSIDIARIES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Nestle Holdings v. Commissioner
Docket No. 21562-90.
United States Tax Court
T.C. Memo 1995-441; 1995 Tax Ct. Memo LEXIS 439; 70 T.C.M. (CCH) 682; September 14, 1995, Filed *439 Decision will be entered under Rule 155. Joel V. Williamson, Joseph R. Goeke, Daniel A. Dumezich, Roger J. Jones, Alexander Spitzer, Gary P. Kirschenbaum, David A. Hyman, David F. Abbott, Glenn A. Graff, Stephen A. Kubiatowski, Scott M. Stewart, Jeffrey B. Frishman, Thomas L. Kittle-Kamp, and M. Ellen Robb, for petitioner. Theodore J. Kletnick, Jeannette D. Pappas, Rose E. Gole, Curt M. Rubin, Peter J. LaBelle, Suzanne L. Corbin, Paul L. Darcy, Elizabeth A. Maresca, Melanie M. Garger, Rajiv Madan, and Nicholas G. Kokis, for respondent. Table of Contents Findings of Fact I. Corporate Structure and Business II. Carnation Acquisition A. Background B. Evaluation C. Negotiation and Board Approval D. Merger Agreement E. Tender Offer and Subsequent Events F. Carnation Stock Trading III. Financing of Petitioner's Acquisition of Carnation A. Background B. Nestle Analysis of Acquisition Financing C. Acquisition Financing 1. Commercial Borrowings: 4(2) Note Program 2. Related-Party Financing D. Petitioner's Offerings on the European Financial Market E. Subsequent Related-Party Advances F. Repayments on the Related-Party Financing 1. NSA Advance 2. NSA Subsequent Advances
*440 3. Maggi Advance G. NCC-Carnation Loans H. Petitioner's Financial Statements I. Summary of Disallowed Interest Expense IV. Section 338 Election: Valuation of Carnation Assets A. Background B. Carnation Inventory C. Trademarks and Trade Names D. Unpatented Technology 1. Flash-18 2. Drying/Instantizing 3. Coating 4. Mibolerone Dog Food 5. Low-pH/Hot-Fill-and-Hold V. Sale of Trademarks and Technology Opinion I. Introduction II. Interest Deduction A. Intention to Create Debt B. Reasonable Expectation of Repayment C. Economic Reality III. Valuation Under Section 338 Election A. Inventory 1. Disposal Costs a. SG&A Expenses b. Intangibles' Charge 2. Holding Costs 3. Profit 4. Test of Reasonableness B. Trademarks and Trade Names 1. Petitioner's Expert Report a. Profit-Split Method b. Selling-Price-Differential Method c. Econometric Method d. Relief-from-Royalty Method 2. Respondent's Experts: Relief-from-Royalty Method C. Unpatented Technology 1. Graham's Analysis 2. Reilly's Analysis D. Goodwill and Going Concern Value 1. Arm's-Length Bargain and Adequate Information 2. Control Premium 3. Insider-Trading Premium IV. The Carnation Sale of Technology *441 and Trademarks V. Section 6661 Addition to Tax VI. Summary COHEN, Judge COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined deficiencies in petitioner's Federal income taxes as follows: Taxable Year Ended
Amount
December 31, 1983 $ 38,934,552
December 29, 1984
21,764,946
December 28, 1985
285,591,539
Respondent also determined an addition to tax of $ 61,514,950 under section 6661 for the taxable year ended December 28, 1985. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. After settlement of numerous significant issues, the issues remaining for decision pertain to the acquisition of Carnation Co. (Carnation) by petitioner Nestle Holdings, Inc. (petitioner), and are: (1) Whether petitioner and Carnation are entitled to interest deductions of $ 131,739,791; (2) what was the fair market value (FMV) of Carnation's inventory, trademarks and trade names, unpatented technology, and goodwill and going concern as of January 10, 1985; (3) whether Carnation must recognize capital gain on its *442 sale of certain assets to Nestle S.A. (NSA); and (4) whether petitioner is liable for an addition to tax under section 6661. FINDINGS OF FACT Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. Petitioner filed consolidated Federal income tax returns on an accrual basis during the years in issue and filed an amended Federal income tax return for the taxable year ended December 28, 1985. I. Corporate Structure and Business
Petitioner is a U.S. domestic corporation, with its principal place of business in Stamford, Connecticut. At all material times, petitioner was a first-tier subsidiary of NSA, a publicly held corporation headquartered in Vevey, Switzerland. Through at least 25 subsidiaries, NSA was engaged in worldwide business activities, and the term "Nestle" in this opinion refers to the global family of NSA affiliated entities. In many instances, NSA did not directly own its subsidiaries. For example, petitioner was the holding company for various Nestle operating subsidiaries located in the United States, including The Nestle Co. (later Nestle Foods Corp.); Libby McNeill & Libby, Inc.; the Stouffer *443 Corp.; and, after 1985, Carnation. Petitioner had relatively strong brands in the U.S. market, including Nestle Crunch. Nestle's specific products included roast and ground coffee, chocolates, milk, frozen foods, culinary products, food ingredients, soups, fruit drinks, and baby food. Nestle also engaged in the hotel, restaurant, pharmaceutical, cosmetic, and other businesses. II. Carnation Acquisition
A. Background
During the early 1980's, Nestle was not satisfied with the performance of its operations in the United States, its internal growth in the United States, or the percentage of its worldwide sales that came from the U.S. market. NSA believed that its U.S. operating companies had weaknesses that included management, market share, sales organization, distribution, and an inadequate food service business. NSA did not, however, consider brand weakness as a reason for its shortcomings in the United States. Due to the global nature of the food industry, Nestle considered the improvement of its position in the U.S. market to be an important long-term objective. Nestle desired to increase the U.S. portion of its total worldwide sales with products that complemented *444 its worldwide product portfolio. To achieve this objective, Nestle planned to employ a strategy of both internal growth and acquisitions of U.S. companies. Petitioner acquired Paul F. Beich; Hills Bros. Coffee, Inc.; MJB Co.; and Chase and Sanborn, Inc., as part of this objective. J.M. Biggar (Biggar) was the president and a member of the board of directors of petitioner. Helmut Maucher (Maucher) was the chief executive of NSA. The top level management of NSA was a three-person group called the Executive Committee, and, during the summer of 1984, Maucher, Carl L. Angst (Angst), and Jose Daniel (Daniel) served on that committee. Angst and Daniel were both general managers and members of the NSA board of directors. Angst was also a member of petitioner's board of directors. NSA formed an acquisitions group to study major food companies for potential acquisition. E.J. Bignami (Bignami), a senior vice president of NSA, was in charge of the acquisitions group and reported to Angst. As the head of the acquisitions group, Bignami continuously gathered information on food companies and potential acquisition candidates. Carnation was a publicly traded California corporation with 20 domestic *445 divisions, 13 domestic subsidiaries/affiliates, and 47 foreign subsidiaries/affiliates. Primarily, Carnation made and sold human and pet food products; however, Carnation was also involved in other businesses, such as the scholastic market and the manufacture of cans. In January 1984, NSA became aware that Carnation might be available for acquisition. NSA initially was not interested in pursuing an acquisition. In March 1984, Angst was contacted by First Boston and informed that Carnation was "on the market" because certain of the major Carnation shareholders, the Stuart family group (family group), wanted to sell the group's shares and thought that a sale to Nestle might be beneficial. Members of the family group were the relatives of E.A. Stuart, who individually or beneficially owned 9,389,189 shares of Carnation stock, or approximately 26.9 percent of the outstanding shares of Carnation common stock. Angst was not enthusiastic about Carnation. Maucher, however, persuaded Angst that the Carnation brand image and pet food products were worth investigating. On March 28, 1984, the Executive Committee discussed Carnation and decided that a contact by Maucher was to be arranged. In *446 April 1984, Maucher asked Angst to take responsibility for evaluating Carnation as an acquisition, and Angst became the primary representative of Nestle in discussions with Carnation concerning the acquisition. On May 18, 1984, the Carnation board of directors retained Kidder, Peabody & Co. Inc. (Kidder) for advice on takeover-defense measures because of speculation that Carnation was a takeover candidate. In August 1984, Kidder prepared a Leveraged Buyout Analysis (LBO analysis) for Carnation. That analysis contained a series of computations analyzing the feasibility of an LBO at various stock prices and leverage ratios, assuming interest rates in the range of 15 to 17 percent. B. Evaluation
Nestle engaged First Boston as its adviser with respect to the Carnation acquisition. In July 1984, First Boston prepared materials that included a description of Carnation and its subsidiaries, a financial comparison of Carnation to selected food companies, comparable acquisitions in the food and beverage industry, and market price data. A separate set of materials that was prepared by First Boston in July 1984 analyzed various acquisition prices as a multiple of earnings per share, revenues, *447 cash-flow, and book value. In July 1984, Daniel N. Regolatti (Regolatti), senior vice president of NSA and head of the finance department, prepared a financial study of the operations and stock price of Carnation and financial "reflections" on an acquisition of Carnation. Regolatti suspected that the Carnation stock price was high because of takeover rumors. However, Regolatti also noted that the financial analyst community had made favorable comments about the domestic performance and expected operating earnings of Carnation. Regolatti further noted that Carnation was overcapitalized and had an excess of cash over bank debt that could reduce Nestle's cash payment for Carnation if Nestle followed its usual practice of financing working capital with debt. The first meeting between Nestle and Carnation took place on July 19, 1984, in Los Angeles, California. Angst, representing Nestle, met with H.E. Olson (Olson), chairman of the board and chief executive officer of Carnation, and T.F. Crull (Crull), president and member of the board of directors of Carnation. One purpose of the meeting was for Angst to "get a feel" for the Carnation management, and Angst determined that the Carnation *448 management would not be opposed to a takeover by Nestle and might even welcome it. At the July 19, 1984, meeting, Angst expressed concern that leaks and rumors had caused a rise in the price of Carnation stock and that additional leaks would cause further increases that could jeopardize the potential acquisition. Angst also requested, and Olson agreed to provide, certain information so that Nestle could evaluate Carnation. In a memorandum to Maucher written after the meeting, Angst stated: Mr. Olson agreed to delegate a trustworthy member of their staff to provide the information we require. Among others, I mentioned that I would like to understand a little bit better their policy with regard to capitalization and depreciation and, above all, we must have turnover and profit information per major product lines and per country. Once this information is in hand, we can then proceed to assess the value of the company to us. At this point in time we shall get together with Mr. Olson and Mr. Crull to negotiate a take-over price. As a first approximation of an acceptable take-over price, the share value on Monday July 23rd is $ 62.-, amounting for 347 million shares to $ 2.15 *449 billion. A bid of $ 75.-/share would amount to some $ 2.6 billion, which, at the current rates, exceeds Sw.Fr. 6 billion. In case we decided to pursue this acquisition, absolute secrecy is of utmost importance. On the Carnation side, only Messrs. Olson, Crull and Stewart [sic] know about our meeting in Los Angeles. On the Nestle side there is a larger number, but what I am really concerned about is First Boston. We shall impress upon them that there will be no transaction if confidentiality cannot be assured.
On August 9, 1984, a second meeting was held in New York, New York. Olson requested this meeting in order to assess the seriousness of the intentions of Nestle before giving NSA the nonpublic information that had been requested by Angst at the first meeting. This meeting was not intended to be a negotiation session; but the price of $ 75 per share was mentioned by Angst as a potential offering price, and Olson indicated that this price was too low. The third meeting took place on August 20 through August 22, 1984, in Vevey, Switzerland. Prior to this meeting, Nestle management had accumulated data on the U.S. operations of Carnation and felt that it had enough information *450 about the U.S. operations to make a reasoned judgment as to the U.S. business. Through petitioner, a U.S. competitor of Carnation, Nestle had information pertaining to the quality of the distribution, warehousing, and raw material purchasing of Carnation as well as a qualitative evaluation of Carnation products. However, Nestle wanted to receive input from Crull personally and also to discuss Carnation's business outside the United States. Crull and J.N. Kvamme (Kvamme) of Carnation met with Nestle personnel to discuss Carnation operations in various countries. Because of the secrecy concerns of Nestle, a minimal number of Nestle personnel were involved. The meetings on August 20 and 21, 1984, focused on international operations, and Nestle personnel probed Crull and Kvamme with questions about Carnation, including why Carnation had "written off" Mexico, what kind of equipment Carnation had, and why the costs of production of Carnation were lower than those of Nestle. Crull gave his personal evaluation of various Carnation managers. Also, Crull and Kvamme provided Nestle with the confidential and nonpublic information that had been requested, including financial information for different *451 product lines in various countries. On August 22, 1984, Crull and Kvamme met with Angst and Maucher, who informed Crull and Kvamme that Nestle had a serious interest in Carnation and that Nestle personnel were already "grinding numbers" and looking at synergism to see whether that interest could turn into an offer. After the Vevey meeting, the Executive Committee unanimously decided to propose the Carnation acquisition to the board of directors. At an NSA Committee of the Board of Directors meeting on August 24, 1984, Angst noted that he had been told by Crull that the majority shareholder of Carnation would ask for $ 90 per share. Angst stated that he believed that the most important element in determining the price was the stock exchange value, which, he said, on average, corresponds to 10 times the profits. Angst stated that a price of $ 90 per share could be justified based on the profits realized by Carnation in 1983, the estimated profits for 1984, and the effects of synergy. Maucher indicated that these estimates did not take into account qualitative and quantitative advantages that would result from the increased market share in the United States and the synergy that would *452 occur in the future. Angst indicated that he would prefer to have his authorization to negotiate limited to $ 85 per share so that he could say, if the price asked by Carnation exceeded $ 85 per share, that he had to submit the matter to the board. Prior to formal price negotiations, NSA prepared several studies of Carnation including: NSA and Carnation consolidated balance sheet and the effect of the acquisition on NSA's balance sheet; justification of a $ 90-per-share purchase price; Carnation acquisition price analysis; and sales and net income figures for Carnation's products and businesses for 1982 through 1985 (estimated). C. Negotiation and Board Approval
On August 30, 1984, Angst met with Olson and Crull in New York to engage in price negotiations. Angst opened the meeting by offering $ 80 per share, which Olson immediately rejected. Olson contended that the price should be determined with regard to the earnings anticipated for 1985, which justified a price of $ 90 per share. In response, Angst stated that Nestle would make the $ 80-per-share offer directly to the family group, which owned approximately 26.9 percent of the outstanding shares of Carnation. In response, *453 Olson raised the possibility that a leveraged buyout might bring between $ 88 and $ 90 per share. Crull expressed regret that there was no concession from Nestle; Angst concluded that a $ 80-per-share offer made directly to the family group might cause an unfriendly atmosphere and, thus, he decided to raise the offer to $ 82 per share. When Olson insisted that the $ 82-per-share offer could not be accepted, Angst suggested that Olson show some flexibility. Olson then made an $ 87-per-share counteroffer, which Angst rejected. The meeting ended without agreement. The remainder of the negotiations took place through many telephone conversations. First Boston suggested that an offer of $ 83-1/2 per share be offered. Angst believed that $ 83 per share was a negotiable price. A final agreement was reached at the price of $ 83 per share, subject to the approval of the Nestle board of directors. The NSA board of directors met on September 3, 1984, and approved the acquisition of Carnation at $ 83 per share. The minutes from that meeting reflect comments made by the directors, including the following evaluation by board member H. Strasser: Mr. H. Strasser has evaluated this transaction *454 favorably after having studied the file which was submitted. It is a solid business, benefiting from an interesting goodwill and good products, certain of which will open new markets to us. It is necessary to be courageous to propose an investment as great as this.
Angst stated at the board meeting: "The price of US$ 83 is high but if one considers the future prospects of Carnation and the forecasts for the company for 1985, the price is fully justified." Angst was praised at the meeting for his handling of the negotiations.
Kidder provided the Carnation board with a written opinion letter and report as to the fairness of the $ 83-per-share offer. The Carnation board of directors met on September 3, 1984, and unanimously adopted a resolution approving the $ 83-per-share offer and recommending the offer to the Carnation shareholders. On September 4, 1984, Angst and Maucher sent a telex to Olson and Crull stating: Our negotiations, while sometimes difficult, were always fair and we greatly appreciated your open and frank approach to the solving of problems. We consider it a privilege to have you as partners and we are looking forward to a fruitful and mutually interesting *455 cooperation with your esteemed company.
D. Merger Agreement
Prior to September 3, 1984, petitioner formed a subsidiary, NHI Sub., Inc. (NHI Sub.), to facilitate the acquisition of Carnation. On September 3, 1984, petitioner, NHI Sub., and Carnation entered into an agreement entitled "Agreement and Plan of Merger" (merger agreement), which provided that petitioner would make a tender offer at $ 83 per share for any and all outstanding common shares of Carnation stock. The merger agreement provided that, after the tender offer was completed, NHI Sub. and Carnation would merge and that Carnation would be the surviving legal entity. The merger agreement also provided that, at the time of the merger, each outstanding common share of Carnation not owned by petitioner would be converted into a right to receive $ 83 in cash from petitioner. On September 3, 1984, petitioner also entered into a stock purchase agreement with the family group, which provided that the members of the family group would sell all of their shares of Carnation common stock to petitioner for $ 83 per share. E. Tender Offer and Subsequent Events
Petitioner made the tender offer to purchase the outstanding *456 shares of Carnation common stock on September 5, 1984. The tender offer provided that petitioner, as the purchaser, could amend or terminate the offer if it became aware of any facts that, in its sole judgment, might have material adverse significance with respect to the value of the Carnation shares to petitioner or Nestle. Representatives from NSA and petitioner and accountants from Peat, Marwick, Mitchell & Co. (PMM) and from Price Waterhouse (PW) visited Carnation in Los Angeles from September 18 through 27, 1984. The main purpose of this visit was to evaluate Carnation's corporate organization; reporting, planning, and controls; external auditing; internal auditing; income tax situation; and employee benefits. Another purpose of the visit was to meet with Carnation management in an effort to create "goodwill" for Nestle. Pursuant to the stock purchase agreement, petitioner acquired all of the stock owned by the family group, and the majority of the remaining outstanding stock of Carnation was acquired through the tender offer. On January 4, 1985, the Federal Trade Commission (FTC) approved the acquisition of Carnation by Nestle. On January 10, 1985, Carnation became a subsidiary *457 of petitioner. Pursuant to the merger agreement, on January 30, 1985, NHI Submerged into Carnation. Immediately before the merger, petitioner owned approximately 98.5 percent of the then-outstanding shares of common stock of Carnation. As provided in the merger agreement, Carnation was the surviving legal entity in the merger, and each outstanding common share of stock of Carnation not owned by petitioner was converted into the right to receive $ 83 in cash from petitioner. F. Carnation Stock Trading
During the spring of 1984, the Carnation stock price was in the mid-to-low $ 50's per share. Sometime around July 1984, the price of Carnation stock began to rise. During this time, there were rumors and stories in various newspapers and business publications that the family group wanted to sell its holdings and also that Carnation was a potential acquisition candidate. A June 1984 Wall Street Journal "Heard on the Street" column reported that Carnation was an attractive acquisition candidate because it has "tremendous brand-name strength but management hasn't done anything with it." During July 1984, releases from Reuters stated, among other things, that, according to industry *458 analysts, Carnation was an attractive buyout candidate because of its cash reserves, marketable securities, low amount of long-term debt, consistent earning growth from year to year, and well-known products. During 1984, Carnation retained Kidder to provide various investment banking services. Martin A. Siegel (Siegel) was a vice president, shareholder, and managing director of Kidder and, from this position, learned of material nonpublic information regarding Carnation. Sometime between May 31 and August 1, 1984, Siegel stated his opinion to Ivan F. Boesky (Boesky) that Boesky should purchase Carnation stock. Siegel repeated his recommendation to Boesky after August 21, 1984. From June 1984 through January 1985, entities controlled by Boesky purchased a large quantity of Carnation stock based, in part, on information that was provided to Boesky by Siegel. The Boesky-controlled entities subsequently disposed of most of the Carnation stock through sales or in accordance with the Nestle tender offer. Siegel obtained the information given to Boesky, at least in part, through his work for Carnation. Siegel received at least $ 700,000 from Boesky in exchange for information on various *459 matters during 1982 to 1985. On December 23, 1986, Siegel entered into an agreement with the U.S. Government in which he agreed to plead guilty to two felony charges and to cooperate with the United States. On April 23, 1987, Boesky was charged by the United States with criminal acts and pleaded guilty. III. Financing of Petitioner's Acquisition of Carnation
A. Background
Initially, Nestle planned to finance the acquisition of Carnation with a $ 525 million capital contribution to petitioner and borrowings of $ 2.5 billion from outside sources. In September 1984, petitioner stated, in a Securities and Exchange Commission (SEC) filing, that NSA would make a $ 525 million capital contribution. Nestle also contemplated that the trademarks, know-how, and foreign subsidiaries of Carnation would be transferred to NSA because it was the policy of Nestle that trademarks were owned by the central company in Switzerland and that the international companies were always managed within one entity in one country. On August 31, 1984, Regolatti, head of finance for Nestle, met with an officer of Citibank, N.A. (Citibank), to ascertain the amount that Nestle could borrow if it made *460 a large acquisition. Citibank indicated that Nestle could borrow up to $ 5 billion, and Regolatti stated that he needed $ 2.5 billion by that evening. Citibank put together a syndicate to loan petitioner $ 2.5 billion under a revolving credit agreement, which was guaranteed by NSA and served as bridge financing for the acquisition. The Citibank bridge financing was able to be arranged in a matter of hours because NSA agreed to guarantee petitioner's debt. The guarantee by NSA permitted Citibank to offer the financing without consideration of the creditworthiness of petitioner on a "stand alone" basis. Ultimately, petitioner did not borrow funds pursuant to the proposed revolving credit agreement. While waiting for the FTC to approve the acquisition, Nestle had an opportunity to organize alternative financing, which would be less expensive than the hastily negotiated Citibank bridge financing. Petitioner terminated the revolving credit agreement on December 26, 1984. As early as October 10, 1984, an alternative financing structure was contemplated, and, sometime prior to October 29, 1984, the planned financing structure of the acquisition was revised. The revised plan was to fund *461 the acquisition with: (1) A capital contribution of $ 400 million from Maggi Enterprises, Ltd. (Maggi), a Swiss subsidiary of NSA that sometimes provided funds in the form of loans to companies within the Nestle group; (2) an unsecured related-party debt of $ 925 million; and (3) up to $ 2.1 billion of commercial paper. On December 7, 1984, petitioner stated in an SEC filing that a $ 400 million capital contribution would be made by Maggi. B. Nestle Analysis of Acquisition Financing
As of December 29, 1984, petitioner had a total debt of $ 517,313,000, which consisted of $ 449,309,000 in affiliated notes payable and $ 68,004,000 in other debt, and had total stockholder's equity of $ 653,180,000. Nestle had a policy that each affiliated company should be able to finance its own activities and, thus, studied what level debt petitioner could support after its acquisition of Carnation. As of December 1984, Nestle believed that interest rates in the United States would decrease and that, therefore, petitioner could service a larger amount of acquisition debt than had originally been contemplated. A PMM report that was sent to petitioner on December 17, 1984, explained that interest *462 paid on bona fide debt is deductible, whereas dividends paid on equity are not deductible. In this report, PMM, among other things, analyzed the criteria used by the Internal Revenue Service (IRS) and courts to determine whether a purported debt instrument constituted bona fide debt or disguised shareholder equity; evaluated the ability of petitioner to service debt; and identified the approximate amount of debt that petitioner could maintain on its balance sheet from a debt/service and debt/equity point of view. In the report, PMM recommended that equity contributions be eliminated. On December 20, 1984, employees of Nestle, including Regolatti, met with Robert Decelles (Decelles) of PMM and discussed the approximate proportion of debt that a postacquisition petitioner could maintain without creating a significant risk that respondent would recharacterize debt as equity. Decelles stated that the projected postacquisition petitioner group debt/equity ratios were well within acceptable U.S. tax guidelines and recommended that all of the projected amount of contributed equity be substituted with related-party debt. Decelles also noted that, if, in the future, the equity of petitioner *463 were not sufficient, a capital contribution could be made at that time. Ultimately, petitioner structured the financing of the Carnation acquisition as follows: Commercial borrowings (approximately)
$ 1,600,000,000
Related-party advances
1,325,000,000
Capital contribution
-0-   In a January 7, 1985, filing with the SEC, petitioner stated that the funds from related parties would be provided as unsecured loans. The business reasons for selecting a financing structure with no capital contribution were based upon the following factors: (1) Projected cash-flow that would permit debt service; (2) anticipation that the combined petitioner-Carnation entities would have a high level of cash and investments on hand that could be used to pay down debt; (3) the amount of Carnation assets to be divested; (4) acquisition debt would include short-term or floating-rate debt to take advantage of the anticipated decline in interest rates, thereby reducing the interest expense and cash-flow requirements associated with acquisition debt; and (5) NSA money management policy. The audited financial statements of Carnation for December 31, 1984, reported cash and marketable securities of *464 $ 368,504,000 and a net worth of $ 1,208,623,000. NSA had a policy to hedge debt but not equity. NSA believed that the fall of the U.S. dollar against the Swiss franc was imminent and, thus, did not want to make an equity investment in the United States because such investment would be unhedged. From a rate of approximately 12 percent in August 1984, the 3-month London Interbank Offer Rates for Interest (LIBOR) fell to 8.56 percent by January 8, 1985; 8 percent by December 1985; and 6.44 percent by December 1986. C. Acquisition Financing
1. Commercial Borrowings: 4(2) Note Program
Petitioner raised approximately $ 1.6 billion for the acquisition of Carnation through commercial paper obligations made pursuant to an offering under the private offering exemption of section 4(2) of the Securities Act of 1933, 15 U.S.C. secs. 77a-77aa (1980) (4(2) note program). The 4(2) note program consisted of short-term paper, not to exceed 270 days (4(2) notes). Merrill Lynch and Salomon Bros. were retained as codealers for the 4(2) note program. On December 19, 1984, Standard & Poor's Corp. gave the 4(2) note program an investment grade rating of "A-1+". *465 The 4(2) note program was supported by a note purchase agreement between NSA and petitioner dated November 29, 1984. The note purchase agreement provided that NSA would, if requested by petitioner, repurchase the maturing commercial paper of petitioner if the amount due exceeded the funds available for payment. The 4(2) note program was also supported by unsecured credit lines in the aggregate amount of $ 700 million from 13 unrelated banks. Documents from one of these lines of credit indicate that the Bank of Montreal authorized a $ 50 million line of credit, which was solely at the risk of petitioner, at an interest rate of LIBOR plus 3/8 percent. Those Bank of Montreal documents, approved by bank officials in January and February 1985, also indicated that the Bank of Montreal believed that the debt service capacity of petitioner would be "greatly enhanced with the integration of Carnation" and that "the asset being acquired, Carnation, has historically exhibited strong financial performance". The 4(2) note program was further supported by a $ 1 billion international short-term note facility (International Note Facility) made on December 21, 1984, among petitioner, several banks, *466 including Credit Suisse First Boston Ltd. as lead manager and facility agent, and Bankers Trust Co. as advance agent. The International Note Facility was legally guaranteed by NSA and included a $ 500 million swing-line credit agreement. Petitioner repaid the entire amount borrowed under the 4(2) note program during 1985, and NSA was not called upon to perform under the note purchase agreement. The unsecured credit lines were terminated on February 15, 1985, and the International Note Facility was terminated on November 25, 1985. 2. Related-Party Financing
On January 8, 1985, petitioner received two related-party advances of $ 600 million and $ 725 million from NSA and Maggi, respectively (NSA advance and Maggi advance). On January 25, 1985, NSA sent a confirmation letter, signed by Regolatti, relating to the $ 600 million NSA advance. That letter set forth the terms of the advance, which provided that the advance was short term, on a 3-month revolving basis, and that interest would be calculated at the 3-month LIBOR rate increased by 3/8 percent. The letter also provided that prepayments could be made without penalty. The NSA confirmation letter was executed by Neil Green *467 (Green), treasurer of petitioner, on behalf of petitioner on January 30, 1985. On January 25, 1985, Maggi sent a confirmation letter relating to the terms of the $ 725 million Maggi advance. The letter provided that the advance was to be repaid by a first installment of $ 25 million on March 31, 1987, followed by 20 equal annual payments of $ 35 million on March 31, with the final installment due on March 31, 2007. Prepayments were permitted without penalty. The letter also provided that interest would be calculated at the 3-month LIBOR rate increased by 3/8 percent. The Maggi confirmation letter was executed by Green on behalf of petitioner on January 30, 1985. Neither the NSA advance nor the Maggi advance was subordinated to other debt incurred by petitioner. Although the confirmation letters referred to the financing as "advances", other letters and documents referred to the financing as "loans". For example, on February 10, 1987, Maggi sent a letter to petitioner requesting that petitioner confirm, for the Maggi auditors, the $ 725 million loan. There were no closing binders for the NSA and Maggi advances; however, petitioner recorded the intercompany advances as loans on its *468 books and records. During 1985, the Wall Street Journal reported that the 3-month LIBOR fluctuated between a high of 9.56 percent and a low of 7.88 percent. D. Petitioner's Offerings on the European Financial Market
On or about March 15, 1985, petitioner offered a series of promissory notes on the European financial market in denominations of $ 5,000, aggregating $ 100 million in total principal amount (the 9-7/8 bonds). The 9-7/8 bonds matured on March 15, 1988, and required annual interest payments at the rate of 9-7/8 percent beginning March 15, 1986. One of the terms of the 9-7/8 bonds was that bondholders had an option to require petitioner to redeem the bonds at par if NSA reduced its direct or indirect shareholding in petitioner below 51 percent before maturity of the bonds. NSA did not provide a legal guarantee or enter into a purchase agreement for the 9-7/8 bonds. The 9-7/8 bonds were not supported by any swing line of credit. On or about June 6, 1985, petitioner made a second offering of bonds on the European financial market (extendible bonds). The extendible bonds were offered in denominations of $ 5,000 and $ 50,000 and aggregated $ 100 million in total principal *469 amount. The extendible bonds matured June 5, 1991, but were repayable at the option of the holder on June 6, 1988. Interest accrued on the extendible bonds at an annual rate of 9-7/8 percent. One of the terms of the extendible bonds was that the bondholders had the option to require petitioner to redeem the bonds at par if NSA reduced its direct or indirect shareholdings in petitioner below 51 percent before maturity of the bonds. NSA did not provide a legal guarantee or enter into a purchase agreement for the extendible bonds. The extendible bonds were not supported by any swing line of credit. Petitioner believed that interest rates were going to decrease and, thus, entered into interest rate swap transactions to obtain floating rates. Such swap transactions enabled petitioner to reduce the effective interest rate on the $ 200 million of unrelated-party debt from 9-7/8 percent to approximately 7 percent. In 1987 and 1988, petitioner issued commercial paper in the European bond market (Eurobonds). One of the terms of the Eurobonds was that the bondholders had the option to require petitioner to redeem the bonds at par if NSA reduced its direct or indirect shareholding in petitioner *470 below 51 percent before maturity of the bonds. NSA did not provide a legal guarantee or enter into a purchase agreement for the Eurobonds. The Eurobonds were not supported by any swing line of credit. E. Subsequent Related-Party Advances
During 1985, NSA provided petitioner with additional advances of $ 960 million (NSA subsequent advances) as follows: Date
Amount
June 26, 1985
$ 90,000,000
June 26, 1985
150,000,000
July 29, 1985
120,000,000
Nov. 14, 1985
through
Dec. 3, 1985
600,000,000
$ 960,000,000
Some of the NSA subsequent advances were used to retire maturing 4(2) notes. For each of the NSA subsequent advances, NSA sent confirmation letters signed by Regolatti that provided payment terms for the advances and an interest rate calculated as LIBOR plus 3/8 percent. None of the NSA subsequent advances were subordinated to any other debt of petitioner. There were no closing binders for the NSA subsequent advances. On its audited financial statements for the taxable year ended December 28, 1985, petitioner reported a total of $ 1,740 million in long-term notes payable to affiliates. F. Repayments on the Related-Party Financing
1. NSA Advance
Petitioner *471 repaid the NSA advance during its taxable year ended December 28, 1985, through a series of asset transfers that involved petitioner, NSA, and Carnation. Pursuant to an agreement dated April 30, 1985, Carnation sold its trademarks, trade names, and patented and unpatented technology and know-how to NSA for $ 423,100,000, which was based on a preliminary independent appraisal by American Appraisal Associates (AAA), discussed in detail below. The final FMV of these assets determined by AAA was subsequently increased to $ 425,630,700. Carnation also sold its foreign subsidiaries to NSA pursuant to several agreements for an aggregate price of $ 235,827,071. NSA paid for the Carnation assets (other than foreign subsidiaries) through several transactions. As a result of the sale, NSA recorded an account payable to Carnation of $ 423,100,000, and Carnation recorded an account receivable of the same amount. Carnation recorded an additional account receivable from NSA of $ 2,531,000 to reflect the increase in the AAA final appraisal. Petitioner paid $ 123,100,000 in cash to Carnation to reduce the Carnation NSA account receivable from $ 423,100,000 to $ 300 million, which in turn reduced *472 petitioner's indebtedness to NSA. Carnation issued a dividend of the remaining $ 300 million NSA account receivable to petitioner; petitioner recorded the $ 300 million as dividend income and reduced its indebtedness to NSA by the same amount. Through the sale of the Carnation assets, the amount outstanding on the NSA advance was reduced as follows: Date
Amount
Balance as of 12/31/85
Apr. 30, 1985
$ 423,100,000
May 22, 1985
81,859,714
June 14, 1985
11,542,144
July 3, 1985
62,667,146
Sept. 6, 1985
10,470,669
Sept. 20, 1985
10,360,327
$ 600,000,000
0
Petitioner made interest payments to NSA on the NSA advance primarily through the Nestle netting system, which was an automated system that accounted for transactions among various Nestle entities, as follows: Date
Amount
Apr. 18, 1985
$ 12,450,000
July 15, 1985
6,512,271
Oct. 15, 1985
400,939
$ 19,363,210
Petitioner withheld 5 percent in withholding taxes from each of the interest payments made on the NSA advance and paid such amounts to the IRS. 2. NSA Subsequent Advances
The additional amount of $ 58,927,071 that remained from the sale of the foreign subsidiaries, after reduction of the NSA *473 advance, was used to reduce the balance of the June 26, 1985, NSA subsequent advance of $ 90 million. The following schedule reflects the payments made by petitioner to NSA on the June 26, 1985, NSA subsequent advance of $ 150 million: Year
Amount
Balance as of 12/31/89
1987
$ 10,000,000
1988
7,000,000
1989
7,000,000
$ 24,000,000
$ 126,000,000
The following schedule reflects the payments made by petitioner to NSA on the July 29, 1985, NSA subsequent advance of $ 120 million: Year
Amount
Balance as of 12/31/88
1987
$ 12,000,000
1988
108,000,000
$ 120,000,000
0
The following schedule reflects the payments made by petitioner to NSA on the November 14 through December 3, 1985, NSA subsequent advances of $ 600 million: Year
Amount
Balance as of 12/31/89
1986
$ 30,000,000
1987
30,000,000
1988
30,000,000
1989
30,000,000
$ 120,000,000
$ 480,000,000
On October 15, 1985, petitioner made a quarterly interest payment of $ 6,956,209 to NSA through the Nestle netting system. During the taxable year ended December 28, 1985, petitioner accrued total interest expense attributable to the NSA subsequent advances of $ 18,713,731. After *474 1985, petitioner made interest payments to NSA for the NSA subsequent advances through the Nestle netting system in the following aggregate amounts: Year
Amount
1986
$ 65,964,255
1987
62,078,854
1988
69,369,961
1989
82,350,746
Petitioner withheld 5 percent in U.S. withholding taxes from all of the interest payments made with respect to the NSA subsequent advances and paid the withholding taxes to the IRS. 3. Maggi Advance
During the taxable year ended December 28, 1985, petitioner made interest payments of $ 47,443,446 to Maggi for the Maggi advance. In subsequent years, petitioner made the following interest payments to Maggi on the Maggi advance: Year
Amount
1986
$ 59,020,790
1987
50,983,508
1988
63,447,405
1989
34,659,235
These interest payments were made primarily through the Nestle netting system. Petitioner withheld 5 percent in U.S. withholding taxes from each of the interest payments made with respect to the Maggi advance and paid the withholding taxes to the IRS. Petitioner paid the first installment repayment of $ 25 million to Maggi in 1987 and paid the $ 35 million installment in 1988. In November 1988, when the outstanding *475 balance was $ 665 million, petitioner notified Maggi that it was able to secure more favorable financing and that, on December 14, 1988, it would prepay 11 annual payments of $ 35 million each ($ 385 million). Petitioner paid the $ 385 million prepayment in 1988. The remaining balance of $ 280 million was scheduled to be repaid in 8 annual payments of $ 35 million each, with the first installment to be paid on March 31, 2000, and the last payment due on March 31, 2007. G. NCC-Carnation Loans
Nestle Capital Corp. (NCC) was a wholly owned U.S. subsidiary of NSA until December 27, 1985, when NSA contributed the shares of NCC to petitioner. NCC was made a part of petitioner's consolidated group on December 28, 1985. For the period ended December 27, 1985, NCC filed a Federal income tax return marked "final" and was not a part of petitioner's consolidated group. NCC was engaged primarily in the business of borrowing funds to be used as working capital for petitioner-related or Nestle-related entities in the United States. NCC acted as a source for short-term and medium-term funds by borrowing money via the commercial market, mostly through the section 3-A-3 commercial paper exemption *476 of the Securities Act of 1933, 15 U.S.C. secs. 77a-77aa (1982), and lending money to the U.S. operating companies of Nestle. NSA supported the commercial paper issued by NCC with a note purchase agreement and a 30-day swing line of credit. On September 10, 1984, privately placed unsecured medium-term promissory notes of NCC and $ 24.7 million of Carnation senior debt were placed on Standard & Poor's Corp. CreditWatch due to concerns over the size of the financing required for the Carnation acquisition. The NCC commercial paper program was not placed on CreditWatch. On December 12, 1984, Standard & Poor's Corp. removed the NCC and Carnation debt from CreditWatch. During the taxable year ended December 28, 1985, NCC made approximately 450 loans to Carnation (NCC-Carnation loans). During 1985, Carnation accrued $ 26,222,874 of interest expense associated with the NCC-Carnation loans. In 1985, NCC reported taxable interest income of $ 26,222,874 from payments made by Carnation on the NCC-Carnation loans. As of December 28, 1985, 36 of the NCC-Carnation loans were outstanding. H. Petitioner's Financial Statements
The audited financial statements *477 of petitioner reported the following: Sales
Net Income
Interest
Royalties
Date
($ 000)
($ 000)
($ 000)
($ 000)
12/28/85
$ 5,698,625
$ (6,015)
$ 275,437
$ 54,712
1/3/87
5,959,483
39,267 213,242
85,976
1/2/88
5,951,412
(28,446)
189,104
106,621
12/31/88
6,089,141
13,663 220,616
110,366
12/30/89
6,969,281
59,476 288,589
121,236
Dividends
Dividends
Cash ($ 000)
In Kind ($ 000)
12/28/85
$ 150
0  1/3/87
0 0  1/2/88
0 0  12/31/88
0 0  12/30/89
- $ 49,468
The audited financial statements of petitioner further reported the following amounts of debt payable to affiliated companies: Year Ended
Notes Payable to Affiliates
12/29/84 $ 156,000,000
12/28/85
1,740,000,000
1/3/87
1,718,000,000
1/2/88
1,640,500,000
12/31/88
1,081,500,000
12/30/89
1,035,500,000
I. Summary of Disallowed Interest Expense
In the notice of deficiency, respondent disallowed the following amounts of interest expense associated with the advances from related entities to petitioner and Carnation: Preacquisition Loans to Petitioner
Interest
Date
Lender
Amount
Expense
10/18/82
Maggi
$ 15,000,000
$ 1,785,205
2/10/84
Maggi
25,000,000
2,209,375
Acquisition Related Advances to Petitioner
Interest
Date
Lender
Amount
Expense
1/8/85
NSA
$ 600,000,000
$ 19,363,211
1/8/85
Maggi
725,000,000
62,849,696
Postacquisition Advances to Petitioner
Interest
Date
Lender
Amount
Expense
6/26/85
NSA
$ 90,000,000
$ 2,505,259
6/26/85
NSA
150,000,000
6,487,500
7/29/85
NSA
120,000,000
4,361,250
11/14/85
NSA
600,000,000
5,359,722
Subtotal-advances to petitioner
$ 104,921,218
Financing to Carnation
Interest
Date
Lender
Amount
Expense
12/9/85
Maggi
$ 100,000,000
$ 424,542
3/85-12/85
NCC
--   26,394,031
Subtotal-Carnation loans
$ 26,818,573
Total disallowed interest expense
$ 131,739,791
*478 In the notice of deficiency, respondent disallowed interest deductions of petitioner on the grounds that petitioner's acquisition of Carnation lacked economic substance and that, in substance, NSA acquired Carnation. Alternatively, respondent asserted that the interest expense deductions should be reallocated to NSA and/or its affiliates pursuant to section 482 in order clearly to reflect income. IV. Section 338 Election: Valuation of Carnation Assets
A. Background
On November 7, 1984, PMM sent a letter to Green, treasurer of petitioner, discussing the feasibility of petitioner's making an election under section 338. Green asked PMM to provide assistance in hiring an appraisal firm to value the assets of Carnation for the section 338 election. In November 1984, petitioner retained AAA, an unrelated appraiser, to appraise certain assets of Carnation and certain domestic subsidiaries primarily for purposes of petitioner's section 338 election. In a presentation to Nestle, AAA stated that the objective of the valuation was to "Allocate Maximum Part of Purchase Price to Depreciable and Amortizable Assets". An internal "Order For Service" form prepared by AAA representatives *479 recorded: "It is the intention and recommendation of PMM to take a very aggressive posture on the valuation of the intangible assets and to maximize the write-up of these assets." That AAA document also stated: It is PMM's opinion, supported by that of Neil Green of Nestle that our best approach with IRS in this particular negotiation is to provide a fully detailed, comprehensive appraisal report that will provide a backup to all of the data provided in the development of the valuation. * * *
A letter dated November 30, 1984, from AAA to Green stated: Events concerning the appraisal of certain assets of Carnation Company have moved so fast that I find myself confirming our understanding of your requirements as we prepare to provide you our preliminary totals. * * * It is our understanding that the preliminary phase was to provide you with our opinion of the fair market value in continued use of certain intangible assets in order that you can make decisions concerning the divestiture of these assets in 1984.
Petitioner filed an election under section 338 with respect to its acquisition of Carnation stock. This election was effective as of January 10, 1985. With respect *480 to its section 338 election, petitioner made a transitional allocation election pursuant to section 1.338(b)-4T, Temporary Income Tax Reg., 51 Fed. Reg. 23737 (July 1, 1986). As a result, petitioner determined the tax basis of the assets of Carnation pursuant to section 1.338(b)-4T, which, because of a "second tier step-up", resulted in an increase in the tax basis above FMV for some of the assets of Carnation. The return position of petitioner with respect to the value of Carnation assets was based on the valuation report of AAA. In the notice of deficiency, respondent determined that petitioner had not properly allocated the tax basis to the assets of Carnation. Respondent's allocation of tax basis under section 1.338(b)-4T, resulted in a tax basis of Carnation assets that was lower than the FMV for those assets as determined by respondent. Respondent's allocation was based on the premise that the "adjusted grossed-up" basis of the assets was less than their FMV. B. Carnation Inventory
As of January 10, 1985, the operations of Carnation included divisions that were referred to as Grocery Products Divisions and included: Contadina, Evaporated Milk, *481 Instant, Pet Foods, Processed Potatoes, Swift, and Trenton. In addition, the Carnation operations included other divisions and subsidiaries (other divisions) that were engaged in various other lines of business and included: Can; Carnation International Division -- Los Angeles (CILA); Dayton Reliable Tool & Manufacturing Co. (Dayton Reliable); Fresh Milk and Ice Cream; General Office; Genetics; Health & Nutrition; Herff Jones, which included Camera Art School Photographers (Camera Art) and Princeton Industries Corp. (Princeton); Milling, which included the Hawaiian Grain subsidiary; Research Farm; and Seaboard Carton (Seaboard). The Grocery Products Divisions manufactured raw foodstuffs into highly processed, consumer-ready food products. Many of the other divisions also carried on manufacturing operations. Carnation had a goal of maintaining a 98-percent customer service level, or "fill rate", which would mean that, out of 100 customer orders, 98 would be shipped on time, as ordered. Carnation sought to achieve this goal by maintaining finished goods inventory at 11 distribution centers and a number of third-party warehouses throughout the United States. The following Carnation *482 divisions had finished goods inventory on hand as of January 10, 1985: Can; CILA; Contadina; Evaporated; Fresh Milk and Ice Cream; General Office; Genetics; Health & Nutrition; Herff Jones, which included the Camera Art and Princeton subsidiaries; Instant; Milling, which included the Hawaiian Grain subsidiary; Pet Foods; Processed Potatoes; Seaboard; Swift; and Trenton. The following Carnation divisions had raw materials inventory on hand as of January 10, 1985: Can; CILA; Contadina; Dayton Reliable; Evaporated; Fresh Milk and Ice Cream; General Office; Health & Nutrition; Herff Jones; Instant; Milling, which included Hawaiian Grain; Pet Foods; Processed Potatoes; Research Farm; Seaboard; and Trenton. For financial and tax accounting purposes in 1984, Carnation inventory was reported at the lower of cost or market. All Carnation divisions kept inventories on a first in, first out basis, except for gold inventories at Herff Jones, which were kept on a last in, first out basis. Carnation maintained an on-line inventory management system for the Grocery Products Divisions called the IC system. The IC system was updated daily, incorporating production from the prior day and sales from *483 the current day. Based on the information contained in the IC system, Carnation regularly prepared a report entitled "IC19" that provided a listing of the inventory quantity (at the product code level) at each company location. An IC19 report was created on December 31, 1984, and an IC19 report for January 10, 1985, could have been printed on or about January 11, 1985. This report would have provided the number of units in inventory on January 10, 1985, for the Grocery Products Divisions. Carnation closed its books on December 31, 1984, and the closing of its books was based on physical inventories taken in the latter part of 1984 that were rolled forward to the yearend. This is the period for which PW performed its annual audit of Carnation. Carnation did not close its books on January 10, 1985, nor did it take a physical inventory on January 10, 1985. The book inventory of Carnation as of December 31, 1984, was $ 413,564,000. Among the assets appraised by AAA were the inventories of Carnation and certain subsidiaries. In appraising the inventory of Carnation, AAA used the Carnation December 31, 1984, inventory count, determining that it was not necessary to perform a "rollforward" *484 from December 31, 1984, to January 10, 1985. AAA determined that the FMV of the inventory of Carnation was $ 487 million as of January 10, 1985, under the comparative sales method. In the notice of deficiency, respondent determined that the basis in the Carnation inventory was less than the basis ascribed by petitioner pursuant to its section 338 election; however, respondent did not raise the issue of use by petitioner of the December 31, 1984, inventory count for the determination of FMV on January 10, 1985. As a result of respondent's reduction of inventory, respondent decreased the Carnation cost of goods sold and increased the taxable income of petitioner for the taxable year ended December 28, 1985. C. Trademarks and Trade Names
Carnation owned more than 3,000 trademarks and trade names worldwide. The Carnation trademarks and trade names that are in dispute are from the following divisions of Carnation: Contadina, Dairies, Evaporated, Instant, Pet Food, Processed Potatoes, Trenton/Swift (Food Service). These trademarks and trade names include: Coffee-mate, Mighty Dog, Instant Breakfast, Processed Potatoes, Buffet Cat Food, Fresh Milk/Ice Cream, Trenton Foods, Fancy Feast, *485 Contadina, Friskies Dry, Coffee-mate FS, Hot Cocoa-Sugar Free, Hot Cocoa Mix FS, Contadina FS, Breakfast Bar, Malted Milk, Canadian TM, Instant Breakfast FS, Evaporated Milk, Bright Eyes, Nonfat Dry Milk, Hot Cocoa Mix, Slender/DIY Diet, Chef's Blend, Come N Get It, and Bon Bon's. A known trademark has implicit value in that it relieves its owner of the cost to develop consumer awareness and promotes a predisposition towards the product. Trademark recognition develops from years of advertising, consistent packaging, promotional campaigns, customer service, and quality control. Depending on the strength of a trademark, the maintenance of the desired consumer awareness level generally requires significant, continuing advertising investment and product renovation. Trademarks lose substantial value without adequate investment, management, marketing, advertising, and sales organization. Consumers purchased Carnation products for many reasons, including the trademarks, advertising, price, promotions, coupons, effective distribution systems, and shelf location. Historically, and particularly during 1980 through 1985, Carnation engaged in a "push" marketing strategy, under which Carnation *486 "pushed" products into the marketplace by offering lower prices, promotions, coupons, and trade deals, rather than through advertising. The reduction in advertising resulted in a reduced Carnation brand awareness at the consumer level. In its Long Term Plan for 1986-1988 (long-term plan), prepared on June 14, 1985, Carnation management viewed the reduced brand awareness as a weakness. In that long-term plan, Carnation management indicated that it planned "to establish stronger consumer pull with existing and new products through increased advertising and consumer effort, while we reduce dollars that go into trade deals." Carnation management viewed its close relationship with the trade and excellent distribution system as strengths but noted, in the long-term plan, that "The major risk Carnation faces is the lack of portfolio diversification in profitable branded products. We are vulnerable in some areas (Coffee-mate, some pet foods) to a competitor entering the market with a perceived uniqueness." On its income tax return, petitioner valued the trademarks and trade names in dispute at $ 315 million. Respondent, in the statutory notice of deficiency, determined that these trademarks *487 and trade names had a value of $ 139,429,000. D. Unpatented Technology
On its tax return, Carnation reported that the value of its unpatented technology as of January 10, 1985, was $ 106,018,700. In the statutory notice of deficiency, respondent alleged that the value of the Carnation unpatented technology was $ 55,947,000. By Amendment to Answer, respondent alleged that the value of the unpatented technology was $ 21,204,000. The technologies that remain in dispute are described below. 1. Flash-18
Flash-18 is a unique food processing system that is particularly suited to the institutional food market and involves canning heavy viscous products that contain large particles and products in large (No. 10) cans. Flash-18 is a unique version of the "hot fill and hold" type of food processing system; Flash-18 was designed to handle low acid foods that conventional hot fill and hold systems could not process. In general, Flash-18 is a continuous process that involves heating a product to sterilizing temperature under pressure and filling the product into a precleaned can at the sterilizing temperature and pressure. The sterility of the can and its contents is then further ensured *488 by sealing and holding the can at high temperature and under pressure for a short time. The Flash-18 process also requires workers to enter the pressurized chamber in which the sterilization takes place. The employees who work in the pressurized chamber experience pressure similar to that of divers in 30 feet of water and are limited to 4 hours in the pressurized tank. Flash-18 was developed by Swift & Co. (Swift) in the early 1960's; Swift filed several patents relative to the Flash-18 process, all but one of which expired in 1983. Trenton Foods acquired the Flash-18 process from Swift; Carnation acquired Trenton Foods in 1966. Carnation made several modifications to the Flash-18 process and also developed formulas and process instructions for its Flash-18 products. The Flash-18 process had a production rate of 90 cans per minute. Although Flash-18 was considered to be a unique technology when it was developed, it was also considered to be more expensive to operate than other canning processes. A plant in Trenton, Missouri, was the only Carnation food processing facility to use Flash-18 to process food products on a commercial scale; no other canning facility in the world used *489 a pressurized tank like the Carnation Trenton facility. Other companies considered using a process like Flash-18 but never adopted it as a commercial process. One of the reasons that Flash-18 was not used by other companies was because Flash-18 products were sold in a narrow market, which was dominated by the Flash-18 products that Carnation produced; the companies that investigated the filling and sterilization process concluded that they did not need, or want, such a process. Carnation investigated the possibility of, but decided against, building a second Flash-18 line at Trenton because the market was not large enough to justify the cost. With respect to the Food Service Division long-term plan, Carnation management recognized, in its 1985 report, that packaging innovation was occurring in the industry that might replace the No. 10 can. However, one of the strategies of Carnation management was to utilize the Flash-18 process to increase volume. In the long-term report, Carnation management determined that the strengths of the Food Service Division included quality products, outstanding direct sales organization, modern distribution centers, excellent reputation in the market, *490 and low cost manufacturing centers. In that report, Carnation management also stated that one of the key factors that contributed to the success of the division was the introduction of new cheese items from the Trenton facility; Trenton production of the Que Bueno Nacho Cheese product reached a 500,000-case sales rate. As of January 10, 1985, there were other sterilizing processes that were available, including Aseptic, retort, and Orbitort systems. The Aseptic process was a continuous process that was best suited for light- to medium-viscosity products like puddings and sauces. The Aseptic process was only used commercially to sterilize products with particulates no larger than a grain of rice. Carnation considered using an Aseptic process for its nonparticulate cheese sauces but determined that such a process was not viable; at the cheese levels of the Carnation products, the Aseptic process caused "burn-on" in the processing equipment that resulted in dark particles flaking off into the cheese sauce. Moreover, the Aseptic process omitted a step of the Flash-18 process that Carnation thought added better flavor. The retort systems were best suited for small-diameter cans. The Orbitort *491 system, a variant of the retort systems, was a batch system that was designed for medium viscous products in large can sizes; the Orbitort system was not suited for heavy viscous products such as pumpkin or corned beef hash. The Orbitort system could produce about 10 cans per minute. 2. Drying/Instantizing
The drying and instantizing processes were used in the Carnation Instant Division to produce products such as Coffee-mate, Instant Breakfast, and Hot Cocoa. Drying is the process of removing water from a liquid mixture to form a powder. Instantizing is the process of rewetting the powder to form an agglomerate that can be readily dispersed in liquids. Instantizing was developed in the 1950's by David D. Peebles (Peebles), an employee of Western Condensing Co. (Western Condensing). Peebles filed several patents on his instantizing process, the last of which expired in 1976. Peebles assigned all of his rights to his instantizing technology to Western Condensing. Carnation developed its initial applications of Peebles' instantizing technology for milk products in a joint venture with Western Condensing in the 1950's. Subsequent to the joint venture, Carnation acquired Western *492 Condensing and all of its rights to the instantizing technology. The Peebles instantizing process was first used by Carnation to produce instant skim milk around 1955. With additional research and development efforts, Carnation further developed the instantizing technology, which it applied to the production of other products such as nondairy coffee creamer and instant breakfast products. Carnation installed the drying and instantizing process at its plant in Jacksonville, Illinois, in 1970 to process Coffee-mate. The Jacksonville plant had a six-story spray dryer. The spray-drying process removed water from a liquid feed containing corn syrup, water, and vegetable or tropical oil to form a powder. The spray-drying process was not contained in the Peebles patents. The Jacksonville plant had a capacity of 22,000 pounds per hour, and the process parameters there were specifically designed for this high output. A certain amount of information regarding the formulation of nondairy creamers was commercially available in the food industry. As of 1985, several private label and generic nondairy creamers were produced. A March 1983 article in Consumer Reports rated several private label *493 brands above Coffee-mate and stated that, although Coffee-mate was the biggest-selling brand of creamer, in its opinion, there were less expensive brands that tasted better. Coffee-mate sold at a premium price and had a high market share; however, Carnation management stated, in their 1985 long-term report: Coffee-mate is monolithic -- the product has only one form and is relatively undifferentiated from competitors. This means that the Brand (at a 39% share) is highly vulnerable to head-on assault by a competitor offering a meaningful technological advantage (such as zero calorie fat). * * *
Carnation management also stated that one of the primary vulnerabilities in the Instant Division was the lack of proprietary technologies. Carnation also used its drying and instantizing process at other plants to produce hot cocoa mixes, Instant Breakfast, Instant Slender, and instant and malted milk. The equipment and processes at these plants differed from that at the Jacksonville plant depending upon the type of product being manufactured. For example, chocolate-flavored Instant Breakfast was difficult to instantize because of its fat content. On October 18, 1984, NSA and Carnation *494 made the following joint statement before the FTC in support of the Nestle acquisition of Carnation: Not only is there enormous supply substitutability and excess capacity in hot cocoa mix production, but it is exceedingly easy to enter into the business of manufacturing and selling the product. A potential manufacturer can enter into the hot cocoa mix business simply by producing the product on its existing equipment, often even without modification, or by constructing, purchasing, leasing or modifying existing manufacturing facilities. The equipment needed to produce hot cocoa mix is relatively inexpensive and is available for delivery in a modest amount of time. * * *
3. Coating
As of 1985, Carnation used a multiple-coating process in the production of its dry cat food brands, Little Friskies and Chef's Blend. This process originated in 1977 when Carnation was making improvements to products that it was marketing in Europe. Carnation incorporated this coating process into its production of dry cat food for the United States in 1983 as part of an effort to make a more competitive product. Around that time, Carnation also made other changes to Little Friskies, including *495 changes in the base product mixture. During 1981 through 1984, Carnation increased advertising spending for Little Friskies. The market leader in the dry cat food industry was Ralston Purina, which produced Cat Chow and Meow Mix and through those products controlled about 53 percent of the dry cat food market; Carnation was a distant second. The Carnation market share increased between 1982 and 1985; however, it did not overtake the Ralston Purina brands. Carnation conducted palatability tests comparing Little Friskies to Cat Chow and determined that, in 1982 through 1984, Cat Chow had a higher palatability rating than Little Friskies but that Little Friskies exceeded Cat Chow in palatability in 1985. Nevertheless, in its 1985 long-term plan, Carnation management recognized that there was little product difference between its dry cat food products and those of Ralston Purina and the other competitors. In that report, Carnation management stated: There is very little brand loyalty in the dry cat food category, presumably because no brand has a meaningful, differentiated position. The average consumer uses 2.7 brands within a three month period, with no brand accounting for more *496 than 40% of an average consumer's usage of dry cat food. The lack of brand loyalty causes a heavy dependency on deal incentives in the category, with 50% of pounds being sold on some form of deal.
4. Mibolerone Dog Food
On September 12, 1967, The Upjohn Co. (Upjohn) was issued a patent for a compound 7-Methyltestosterones (mibolerone), which was an antigenic anabolic steroid. Upjohn's mibolerone patent expired on September 12, 1984. On May 1, 1972, Carnation and Upjohn entered into an agreement (1972 agreement) for the joint development of a pet food product containing mibolerone to suppress estrus in female dogs, which would provide temporary, reversible birth control for dogs. Under the 1972 agreement, Carnation and Upjohn agreed to share the expense for conducting field testing and other studies on mibolerone and Upjohn granted Carnation the exclusive right to use mibolerone in over-the-counter pet food. Carnation and Upjohn communicated on a regular basis concerning developments in the effort to market an over-the-counter mibolerone product. Although the 1972 agreement contemplated a product for dogs and cats, later work revealed an inadequate margin of safety for cats, *497 and the effort for cats was dropped. In 1972, Carnation and Upjohn began a "Lifetime Study" to determine the safety and efficacy of a pet food containing mibolerone. In the lifetime study, the mibolerone compound was fed to a number of dogs of a variety of breeds for approximately 9 years. An Upjohn internal memorandum of November 9, 1982, reported that long-term feeding of mibolerone was associated with an increased incidence of chronic liver disease and changes in the reproductive tract. An Upjohn internal memorandum dated April 21, 1982, stated that "the chances of mibolerone being approved by FDA [Food and Drug Administration] for OTC [over-the-counter] use is essentially nil." From 1974 through 1976, Carnation conducted a "Home Placement Protocol Study" to evaluate the completeness and clarity of the labeling instructions for pet food containing mibolerone. On November 17, 1975, Upjohn requested approval from the Food and Drug Administration (FDA) for sale of mibolerone in a drop form. On October 5, 1976, Upjohn requested approval from the FDA for sale of a dog food containing mibolerone. On April 14, 1978, the FDA granted Upjohn approval to sell mibolerone in drop form through *498 veterinarians by prescription only. After responding to five "incomplete" letters from the FDA (requesting further study and information), on February 16, 1982, Upjohn received FDA approval to sell dog food containing mibolerone through veterinarians by prescription only, with a 24-month usage limitation. Upjohn was aware that the 24-month limitation was due to adverse effects caused by long-term usage. Carnation was aware that dosage restrictions would present problems for over-the-counter sales. Upjohn never marketed the mibolerone dog food as a prescription product; Upjohn and Carnation were aware that the FDA would likely require prescription marketing before it would consider approval for over-the-counter sale. On November 17, 1983, Upjohn filed a request with the FDA for change in status for the mibolerone dog food from sale by prescription to over-the-counter sale. On May 16, 1984, the FDA issued an incomplete letter that denied regulatory approval for over-the-counter sale because of the adverse effects of mibolerone, which required veterinary intervention for monitoring, diagnosis, and treatment. The FDA letter also stated: "Adequate directions for safe use of the product *499 cannot be written in a manner that would be easily comprehended and executed by a lay person in the absence of a veterinarian's guidance." On May 1, 1982, the 1972 agreement expired; thus, on January 10, 1985, there was no agreement between Carnation and Upjohn for the development of an over-the-counter mibolerone product. On February 19, 1985, Carnation and Upjohn entered into a new agreement (1985 agreement), under which Carnation would have exclusive rights to use mibolerone in dog food on a national mass market, over-the-counter basis. On August 2, 1985, the FDA issued a second letter to Upjohn denying over-the-counter status because the range and severity of symptoms from mibolerone required the supervision of a veterinarian. 5. Low-pH/Hot-Fill-and-Hold
"Low-pH/hot-fill-and-hold" technology is a food preservation process. Carnation used the low-pH/hot-fill-and-hold process for processing products with high acid content. Processes for safe sterilization of acidified foods and of naturally acid foods are well known in the food industry and are specified in regulations promulgated by the FDA and many States, including California. V. Sale of Trademarks and Technology
*500 It was the general policy of NSA to have the intellectual intangible assets of an acquired company transferred for FMV to NSA in order to centralize ownership of all brands and technology. Such transfers were made for FMV in order to avoid challenges from the local tax administrators. Prior to the execution of the merger agreement, it was understood that these intangible assets would be transferred from Carnation to NSA at FMV. An agreement dated April 30, 1985 (sales agreement), between Carnation and NSA stated: CARNATION hereby sells, transfers and assigns to NESTLE and NESTLE hereby purchases and acquires from CARNATION as of the date of this agreement all of CARNATION's rights, title and interest in: any and all registered and/or used trademarks, trademark applications, designs, copyrights, patents, patent applications, manufacturing processes, formulae, know-how and any other industrial property rights * * *
The sales agreement provided that the sales price was $ 423,100,000 "subject to any changes which may result from the final findings as to the fair market value assessment currently being carried out by American Appraisal Associates." Carnation and NSA *501 intended for the sales agreement to fix the purchase price at the FMV of those assets. In its final report, AAA increased its determination of the FMV of the trademarks and technology by $ 2,531,000 to $ 425,630,700. The Carnation 1985 certified financial statements stated that Carnation sold certain intangible assets to Nestle based on the appraised value of such assets at January 10, 1985, for an aggregate amount of $ 425,630,000. These statements did not report a change in capital structure, a reserve account, or a contingency for modification of the $ 425,630,700 sales price. On its income tax return, Carnation reported sales proceeds of $ 425,630,700 and an adjusted basis in the trademarks and technology of $ 435,837,000, which included a claimed second tier step-up under section 338; as a result, Carnation claimed a loss on the sale, which it reported as a deferred loss. The NSA 1985 annual report listed the trademarks and technology as an asset valued at SwF (Swiss franc) 900 million and stated that that amount "reflects the capitalisation at the end of 1985 of the balance of the amount paid to acquire the trademarks and other industrial property rights of Carnation, of *502 which a first tranche has already been written off against the profits of the year 1985". In the notice of deficiency, respondent adjusted Carnation's basis in the trademarks and technology as a result of revisions to petitioner's section 338 computation. Respondent determined that the FMV, and thus basis, of the trademarks and technology was $ 196,022,000 and, as a result, determined that Carnation had a short-term capital gain in the amount of the difference between the amount realized and the redetermined adjusted basis. OPINION I. Introduction
The issues presented to the Court relate to the acquisition of Carnation by petitioner. Both parties presented a number of experts to support their positions, all of whom were qualified in different respects. We have closely examined each expert report and the clarifying testimony given at trial. We are not bound by the opinion of any expert when the opinion is contrary to our own judgment. Bausch & Lomb, Inc. v. Commissioner, 92 T.C. 525, 597 (1989), affd. 933 F.2d 1084 (2d Cir. 1991). We may embrace or reject expert testimony, whichever in our judgment is most appropriate. *503 Helvering v. National Grocery Co., 304 U.S. 282, 295 (1938); Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285. Moreover, we are not restricted to choosing the opinion of one expert over another but may extract relevant findings from each in drawing our own conclusions. Chiu v. Commissioner, 84 T.C. 722, 734 (1985). To the extent that we rely on experts, our reliance is based, not on credentials, but on the degree to which their opinions are supported by the evidence and by consistent reasoning. We do not list or discuss the qualifications of the experts; our decision in this case is not based on comparing qualifications, and our listing them would unduly burden this opinion. Similarly, we do not use titles, such as "Doctor" and "Professor", in this opinion because we do not wish to imply any greater deference to the academic experts than to the industry experts. II. Interest Deduction
Respondent's statutory notice determination that, in substance, NSA acquired Carnation was contradicted by respondent's subsequent responses *504 to discovery and to a motion for summary judgment on the interest issue filed by petitioner. In an amended answer, respondent pleaded and now contends that petitioner and Carnation are not entitled to interest deductions totaling $ 131,739,791 on related-party borrowings because such payments, in substance, related to nondeductible capital contributions instead of bona fide loans. Respondent bears the burden of proof on this issue. Rule 142(a). In resolving questions of debt versus equity, courts have identified and considered various factors. See Dixie Dairies Corp. v. Commissioner, 74 T.C. 476, 493 (1980); see also Anchor National Life v. Commissioner, 93 T.C. 382, 400 (1989). Some of those factors include: Presence of a written agreement demonstrating indebtedness, presence of a fixed maturity date, right to enforce payment, intent of the parties, identity of interest between creditor and stockholder, thinness of capital structure in relation to debt, ability of corporation to obtain credit from outside sources, failure of debtor to repay, and risk involved in making advances. No single factor is determinative or relevant *505 in each case. Dixie Dairies Corp. v. Commissioner, supra at 493-494. "The various factors * * * are only aids in answering the ultimate question whether the investment, analyzed in terms of its economic reality, constitutes risk capital entirely subject to the fortunes of the corporate venture or represents a strict debtor-creditor relationship." Fin Hay Realty Co. v. United States, 398 F.2d 694, 697 (3d Cir. 1968). We have stated that the ultimate question is: "Was there a genuine intention to create a debt, with a reasonable expectation of repayment, and did that intention comport with the economic reality of creating a debtor-creditor relationship?" Litton Business Sys., Inc. v. Commissioner, 61 T.C. 367, 377 (1973). Respondent argues that, where, as is the case here, the financing arrangements are between a U.S. subsidiary and a foreign parent, the foreign parent has an incentive to capitalize inadequately the U.S. subsidiary through debt and, thus, that such arrangements should be closely scrutinized because the subsidiary receives a U.S. tax deduction but the foreign parent does *506 not have ordinary income taxable by the United States at the marginal rate. Throughout her brief, respondent applies the relationship between NSA and petitioner to the various factors to justify her position that the advances constitute capital contributions and not loans. The form of the transaction and the labels that the parties place on the transaction may have little significance when the purported debtor and creditor are related parties, and arrangements between a parent corporation and its wholly owned subsidiary invite close scrutiny. Calumet Indus., Inc. v. Commissioner, 95 T.C. 257, 286 (1990); Malone & Hyde, Inc. v. Commissioner, 49 T.C. 575, 578 (1968). Nevertheless, the existence of a bona fide debt is not precluded merely because the debtor and creditor are related parties. Kraft Foods Co. v. Commissioner, 232 F.2d 118 (2d Cir. 1956), revg. 21 T.C. 513 (1954). The Court of Appeals for the Second Circuit has stated: it is one thing to say that transactions between affiliates should be carefully scrutinized and sham transactions disregarded, and *507 quite a different thing to say that a genuine transaction affecting legal relations should be disregarded for tax purposes merely because it is a transaction between affiliated corporations. * * * [Id. at 124.]
Our focus is therefore directed toward a determination of the true nature of the advances at issue. A. Intention to Create Debt
Respondent contends that NSA intended to make a capital contribution to petitioner but characterized its investment as debt so as to obtain tax benefits. In support of its contention that NSA intended to make an equity contribution, respondent argues that NSA stated in SEC filings that it would make a capital contribution to petitioner; that analyses of the financial structure of the Carnation acquisition prepared in July and August 1984 projected capital contributions of between 25 and 50 percent of the projected acquisition price; and that PMM considered only the tax ramifications of debt classification and not the financial implications. Respondent implies that these facts demonstrate that Nestle had tax-avoidance motives, which, under Gilbert v. Commissioner, 248 F.2d 399 (2d Cir. 1957), revg. and *508 remanding T.C. Memo. 1956-137, indicate that the related-party advances were equity. As recognized in Gilbert, however, petitioner's desire to minimize taxes is not conclusive of characterization of the advances. Id. at 406 (quoting Kraft Foods Co. v. Commissioner, 232 F.2d 118, 128 (2d. Cir. 1956)). Here, the evidence is persuasive that NSA and petitioner had a genuine intention that the advances create a debt obligation. The revised financing structure that did not include a capital contribution was the result of additional time for planning and was supported by valid business reasons. As early as October 1984, Nestle contemplated a financing structure consisting of over $ 3 billion of debt, which exceeded the amount of total debt ultimately used. Thus, the ultimate amount of debt was not out of line with earlier financing plans. Moreover, the record contains substantial objective evidence of an intent to create a debtor-creditor relationship. The advances had many of the formalities of a debtor-creditor relationship. See Litton Business Sys., Inc. v. Commissioner, supra at 377-378. *509 The confirmation letters and other correspondence provided documentation of a stated interest rate and a specified repayment schedule, maturity date, or that the loan was revolving. None of the debt was subordinated to the claims of any creditor or shareholder, and petitioner consistently recorded all of the intercompany advances in dispute as loans on its books and records. Further, prior to the Carnation acquisition, petitioner's filings with the SEC represented that the funds obtained from affiliates would be in the form of loans. In addition to the evidence indicating that the advances were loans, there is evidence negating a capital contribution intent. Because of the anticipated fall of the dollar against the Swiss franc and the hedging policy of NSA, NSA had business reasons for not making an equity investment in petitioner. See Irbco Corp. v. Commissioner, T.C. Memo. 1966-67. B. Reasonable Expectation of Repayment
Respondent implies that NSA had no reasonable expectation of repayment on the advances because payment on the advances depended solely upon the success of Carnation. Respondent cites several cases to support its position that *510 an expectation of repayment from corporate earnings is not indicative of bona fide debt. Roth Steel Tube Co. v. Commissioner, 800 F.2d 625 (6th Cir. 1986), affg. T.C. Memo. 1985-58; In re Lane, 742 F.2d 1311 (11th Cir. 1984); Fin Hay Realty Co. v. United States, 398 F.2d 694 (3d Cir. 1968); Segel v. Commissioner, 89 T.C. 816 (1987). The cited cases indicate that the more the advances "are at the risk of and subject to the vagaries of the business, the more they are indicative of equity." Id. at 830. However, the facts that led to equity classification in those cases are distinguishable from the circumstances here. For example, in Roth Steel, repayment was completely dependent on the prospective financial success of the corporation because all of the existing assets of the corporation were subject to security interests and thus were not available as a source of repayment. Roth Steel Tube Co. v. Commissioner, T.C. Memo. 1985-58. In Lane, advances were considered to *511 be equity because many of the advances contained no provisions for interest and the purported creditor sought repayment only when it was beneficial to the corporation. In re Lane, supra at 1317. In Fin Hay Realty and Segel, the payments were made to finance the development of newly established corporations and, at the time of the advances involved there, it could not be projected that repayment could be made out of assets or soundly anticipated cash-flow. Here, Nestle anticipated that the combined petitioner-Carnation entities would have a high level of cash and investments on hand that could be used to pay down debt; that divestiture of assets would be used to pay debt; and also the cash-flow from the combined entities would be adequate for debt service. The advances in this case contained interest and payment provisions, and timely principal and interest payments were made. Moreover, the advances were made as part of an acquisition of a complete, existing enterprise that had valuable assets and an established market position. Such factors indicate that the advances were not solely dependent on the risk of the business. Litton Business Sys., Inc. v. Commissioner, 61 T.C. at 378; *512 see also Malone & Hyde, Inc. v. Commissioner, 49 T.C. at 578 (expansion of nucleus involves minimal business risk). C. Economic Reality
Respondent makes several arguments as to why the advances, in terms of economic reality, were capital contributions. First, respondent contends that petitioner could not have obtained financing from outside sources without the financial backing and guarantees of NSA and that this factor indicates that the related-party advances were capital contributions. The question of whether petitioner could have obtained comparable debt financing from independent sources is a relevant factor in measuring the economic reality of the debt in question. Estate of Mixon v. United States, 464 F.2d 394, 410 (5th Cir. 1972); Nassau Lens Co. v. Commissioner, 308 F.2d 39, 47 (2d Cir. 1962), remanding 35 T.C. 268 (1960). Evidence that a taxpayer could not obtain loans from independent sources indicates that the related-party advance was in substance a capital contribution. Calumet Indus., Inc. v. Commissioner, 95 T.C. 257, 287 (1990). *513 Respondent emphasizes that petitioner attempted to borrow from independent creditors but was unable to obtain loans without a guarantee by NSA. Respondent contends that Citibank required a guarantee by NSA and that Citibank involved a bank syndicate to make the loan to petitioner because it did not want to bear the risk of lending $ 2.5 billion to one company. Respondent further contends that the outside financing element of the Carnation acquisition loans required a guarantee by NSA. Respondent also argues that the NSA note purchase agreement for the 4(2) note program constituted a guarantee by NSA. With respect to the Citibank arrangement, the record indicates that the NSA guarantee enabled the bridge financing to be arranged in a matter of hours, in response to a perceived urgency related to the acquisition process. The NSA note purchase agreement may have influenced the investment grade rating and presumably lowered the interest cost of the 4(2) notes, without necessarily being an absolute requirement for independent financing. Petitioner placed debt in the European financial market, without any guarantee or purchase agreement by NSA, in 1985, 1987, and 1988. Petitioner may *514 not have been able to borrow the entire amount of the advances at issue directly from a single bank without the NSA guarantee; however, on this record, we are satisfied that petitioner, as a separate entity, could have obtained the full amount from some combination of private lenders and commercial banking sources. See Litton Business Sys., Inc. v. Commissioner, 61 T.C. at 379. Respondent also contends that the interest rate charged on the related-party advances was an exceptionally low rate and that petitioner could not have obtained a LIBOR-plus-3/8-percent rate from independent lenders. Respondent submitted the expert report of Jacob R. Brandzel (Brandzel). In his report, Brandzel opined that the credit ratings of petitioner's long-term borrowings would have been "non-investment grade" in the absence of the NSA support agreements and that petitioner would not have been able to service noninvestment grade debt. Brandzel stated that the applicable noninvestment grade debt interest rate would be 16.6 percent. Brandzel's opinion that petitioner could not obtain independent debt financing at a rate below 16 percent is not supported by the record. During *515 1985, petitioner obtained medium-term financing from independent parties at a rate of 9-7/8 percent, without guarantees by NSA, despite the amount of the outstanding acquisition debt. At trial, Brandzel admitted that he was not familiar with, and that his analysis did not consider, petitioner's European debt offerings. Further, in his rebuttal report, Brandzel inaccurately states that petitioner believed that interest rates were going to increase and thus that petitioner entered into interest rate swaps to fix its interest rate. To the contrary, the record indicates that petitioner believed that interest rates would decrease and entered into interest rate swap transactions to obtain floating rates. Such swap transactions enabled petitioner to reduce the effective interest rate on the $ 200 million of unrelated-party debt to approximately 7 percent. We conclude that Brandzel's opinion as to the interest rate available on independent-party financing is not reliable. As a further argument that the LIBOR-plus-3/8-percent interest rate was low, respondent notes that the Kidder Carnation LBO analysis used interest rates of 15 through 17 percent as of August 1984. Respondent also cites *516 interest rates, including LIBOR plus 2 percent and LIBOR plus 2-1/4 percent, incurred by several corporations in other leveraged transactions that were listed in Brandzel's report. We are not persuaded that these rates indicate that LIBOR plus 3/8 percent was unreasonably low. The Kidder analysis is a series of computations analyzing the feasibility of an LBO at various stock prices, assuming interest rates from 15 to 17 percent. Nothing in that analysis asserts that those interest rates were the only possibilities. Nothing in that analysis addressed the interest rates that could be obtained by a purchaser such as petitioner, who, through a combination with Carnation, could potentially generate synergies and additional cash-flow. Furthermore, the Kidder analysis does not address the possibility of using interest rate swaps to take advantage of the anticipated decline in interest rates. The rates incurred by corporations in other leveraged transactions that were cited by respondent are also not determinative here. Because of the infinite number of factors that may affect the interest rates incurred on the debt in those transactions, which differ in each particular situation, we cannot *517 compare the rates on the debt there to the rates on the debt here. We do however note that, in his report, Brandzel stated that the debt used in the Esmark, Inc., acquisition of Norton Simon was at "prime, LIBOR plus 3/8 percent, CD plus 1/2 percent or any rate mutually agreed" by Esmark, Inc., and the bank. Respondent also contends that the repayment terms of the related-party advances were lenient and could not have been obtained from outside lenders. Respondent argues that some of the advances had maturities of over 20 years and that, in most cases, the long-term advances deferred repayment for 2 years. Respondent contends that these long maturity periods reflect equity, not debt, and that the deferred maturities indicate that NSA knew that it had overloaded petitioner with debt and that petitioner lacked the cash-flow to reduce its debt obligation. Respondent also argues that independent creditors would have imposed nonfinancial covenants that would place restrictions on the declaration of dividends, asset sales, and incurring additional debt. At trial, Regolatti testified that petitioner could have borrowed the necessary acquisition funds, without NSA guarantees, but that such *518 loans would have been at a higher interest rate (i.e., LIBOR plus 1 to 1-1/4 percent) and would have contained certain conditions such as maintenance of working capital, restrictions on sales of assets, and declaration of dividends. In evaluating the terms of related-party debt, we do not apply a mechanical test of absolute identity between the related-party advances and the debt that actually or hypothetically would have been available to petitioner, but, instead, we seek to determine whether the terms of the advances were a "patent distortion of what would normally have been available" to petitioner. Litton Business Sys., Inc. v. Commissioner, 61 T.C. 367, 379 (1973). We have recognized that "different creditors invariably undertake different degrees of risk and that, where debtor and creditor are related, the lender might understandably offer more lenient terms than could be secured elsewhere." G.M. Gooch Lumber Sales Co. v. Commissioner, 49 T.C. 649, 659 (1968), remanded on a different issue 406 F.2d 290 (6th Cir. 1969). The terms of the related-party advances here cannot be characterized *519 as a "patent distortion" of what would normally have been available to petitioner as independent-debt financing. Cf. Segel v. Commissioner, 89 T.C. 816, 832-834 (1987) (purported loans that contained no written agreement, security interest, provision for the payment of interest, or a schedule for repayment justified a conclusion that no outside lender would have made loans on the "anywhere near the same" terms). Respondent also contends that the financial ratios of petitioner demonstrate that the capital structure of petitioner was inadequate. Thin or inadequate capitalization is strong evidence that advances are capital contributions because "Any 'loan' to the corporation in such circumstances would necessarily be venture capital in reality, for any business loss by the corporation would be reflected in an inability to repay the 'loan'". Gilbert v. Commissioner, 248 F.2d 399, 407 (2d Cir. 1957). Respondent's inadequate capitalization argument is based mainly on the contention that petitioner did not have adequate cash-flow from its operations to cover its debt obligations. Respondent relies heavily on the expert report *520 of Brandzel. In his report, Brandzel computed the interest coverage ratio (ICR) of petitioner in an attempt to quantify the ability of petitioner to service interest expense with income from operations. Brandzel computed the ICR as earnings before interest and taxes divided by interest expense. Brandzel reported that, as of December 28, 1985, the ICR of petitioner was 1.2 and that the average ICR of 13 comparable corporations was 3.6. Brandzel also computed the ICR of Beatrice Foods Co. after its acquisition of Esmark, Inc., as 1.9. Citing cases in which we considered industry debt/equity ratios in evaluating whether a particular taxpayer was undercapitalized, respondent contends that the low ICR of petitioner demonstrates that it had an inadequate capital structure. Petitioner contends that Brandzel's methodology for computing ICR does not reflect the ability of petitioner to service the debt, because Brandzel's calculations understated petitioner's cash-flow by excluding the cash-flow associated with amortization and depreciation of petitioner's assets and the sales of Carnation assets to NSA and also because Brandzel overstated petitioner's interest expense. Further, petitioner *521 contends that Brandzel did not consider the high level of existing liquidity on petitioner's balance sheet. We need not determine whether the ICR computations of Brandzel accurately reflect whether petitioner had excessive debt because we are not satisfied that such a ratio is determinative here. At trial, Regolatti testified that Nestle did not calculate the ICR for petitioner because such a calculation was not significant to Nestle. Regolatti explained that Nestle did not maintain a high amount of liquidity in petitioner because, from a foreign exchange risk standpoint, it was more prudent to maintain debt in the currency of the foreign subsidiaries and liquidities in the holding company in the currency of which dividends had to be paid. As an example of this financing principle, Regolatti testified that, before its acquisition, Carnation had debt in its foreign subsidiaries and liquidity in dollars in the U.S. holding company because it had to pay its shareholders in dollars. Regolatti further testified that Nestle's interest was whether, after the acquisition and subsequent sale of certain Carnation assets, petitioner would be able to meet its debt obligations. The record here *522 establishes that petitioner satisfied its debt obligations, and we believe that the evidence of actual repayment is better proof of ability to repay than the calculation of an ICR. Respondent, however, contends that, after the acquisition, petitioner did not have sufficient funds to repay its third-party obligations without subsequent advances from NSA. In Litton Business Sys., we held that an advance from a parent corporation to a subsidiary was debt even though the parent had to make subsequent advances to the subsidiary in order to cover interest payments on the advance account because, despite the additional advances, there was an annual net reduction in the balance of the advance from its inception through the years in issue. Litton Business Sys., Inc. v. Commissioner, 61 T.C. at 380-381. The facts are similar here. Although NSA made subsequent advances to petitioner in 1985, some of which were used to retire maturing 4(2) notes, petitioner reported a net reduction of related-party debt each year after 1985, in addition to making timely interest payments. As we held in Litton Business Sys., such repayment resulting in net reduction "is *523 significant evidence that the parties' substantive actions complied with the form of the transaction as establishing a debtor-creditor relationship." Id. at 381. Respondent also contends that, even when petitioner made repayments to NSA, it did not reduce its overall debt because such repayments were merely a result of refinancing petitioner's debt by the issuance of Eurobonds in 1987 and 1988. The ability of petitioner to issue debt to unrelated parties during this period, however, indicates that petitioner was not overcapitalized and that NSA expected repayment pursuant to the terms of the confirmation letters. Petitioner submitted the expert report and testimony of Daniel P. Broadhurst (Broadhurst), in which Broadhurst computed the total debt/equity ratios of petitioner as follows: Year Ended
12/85
1/87
1/88
12/88
12/89
Total debt/equity
4.46
4.47
4.35
4.57
3.73
Related-party debt
2.98
3.04
2.69
1.71
1.29
Third-party debt
1.48
1.44
1.67
2.86
2.45
Respondent contends that Broadhurst's calculations are misleading in that the financial statements from which Broadhurst made his computations used a pooling method of *524 accounting that resulted in Carnation's obligations to NCC being treated as unrelated-party debt. Respondent's objection to Broadhurst's calculations is not compelling as the majority of the NCC loans were no longer outstanding as of December 28, 1985. Broadhurst's debt/equity calculations, however, provide a general indication that, overall, after the acquisition, petitioner reduced its debt. Petitioner also submitted the expert report and testimony of J. Gregory Ballentine (Ballentine). Ballentine compared the leverage ratios of petitioner to the leverage ratios of independent firms that made large acquisitions from 1981 through 1992. Ballentine determined that the extent of petitioner's debt was not extreme compared to similarly situated independent firms. There is no evidence that the debt/equity or leverage ratios of petitioner were out of line with other companies. To the contrary, respondent's expert, Brandzel, seemed to agree with Ballentine's conclusion by stating in his report that petitioner's "leverage is identical to the average leverage ratio of manufacturing companies making substantial acquisitions". Although the debt/equity and leverage ratios as determined by petitioner's *525 experts do not provide a safe harbor for petitioner, they do counter respondent's allegation of inadequate capitalization. Litton Business Sys., Inc. v. Commissioner, 61 T.C. at 379; see also Kraft Foods Co. v. Commissioner, 232 F.2d 118, 127 (2d Cir. 1956), revg. 21 T.C. 513 (1954). Respondent further contends that the sale of trademarks, patents, unpatented technology, and foreign subsidiaries of Carnation to NSA indicates that NSA had an ownership interest. Citing Segel v. Commissioner, 89 T.C. 816 (1987), respondent argues that the disposal of material assets in order to pay shareholder "debt" is indicative of equity. The facts here are materially distinguishable from those in Segel. There, the "borrower"-corporation experienced financial difficulty and made distributions on the purported loans out of proceeds from the sale of major operating assets as the business was "winding down". Here, petitioner and Carnation were viable entities and did not transfer the assets to unrelated parties as part of a liquidation or cessation of business. Carnation licensed *526 back some of the transferred assets, and petitioner/Carnation reported royalty expenses on its audited financial statements. Respondent argues that petitioner/Carnation "paid a hefty price for the debt reduction by taking on a permanent liability in the form of a royalty obligation". The market, however, apparently disagreed. The royalty obligation did not prevent petitioner from obtaining debt financing from unrelated parties in subsequent years. Noting the disparity in dividends and interest paid from petitioner to NSA during 1984 through 1986, respondent also argues that petitioner's putative "debt" repayments substituted for dividend payments. The Carnation acquisition was a leveraged transaction; interest payments would necessarily reduce the amount available for dividends. This factor is merely another way of stating the debt-equity issue and adds nothing to the analysis. Here, prior to the acquisition, petitioner had over $ 650 million in equity and very little leverage. Petitioner leveraged itself to acquire Carnation, an established entity with an established cash-flow and valuable assets. See Tomlinson v. 1661 Corp., 377 F.2d 291, 299 n.18 (5th Cir. 1967) ("Leverage *527 is the aim of many entrepreneurs, many of whom are quite successful in securing financing on high ratios."). After the acquisition, petitioner was able to obtain financing from unrelated parties. In sum, as we said in Malone & Hyde, Inc. v. Commissioner, 49 T.C. 575, 578 (1968): "we think it unwarranted to apply legalistic and mechanical tests, in the area of parent-subsidiary relationships, without regard to the realities of the business world and the manner in which transactions are handled in the normal and ordinary course of doing business." The notice of deficiency disallowed interest deductions on related-party loans made to both petitioner and Carnation. Respondent has not made any specific arguments with respect to the Carnation loans, other than to argue that the "all debt scheme seems almost preposterous" and that Carnation needed "a massive debt infusion" because of the acquisition debt. The majority of the related-party loans provided to Carnation in 1985 consisted of loans from NCC, which provided working capital loans for Nestle-related entities. Carnation made interest payments, and NCC reported such payments as interest income; as of *528 December 28, 1985, the vast majority of those loans were no longer outstanding. The preponderance of the evidence shows that the related-party loans to petitioner and Carnation were, in substance, debt and not capital contributions. Regardless of the burden of proof, we hold that petitioner and Carnation are entitled to deduct the disallowed interest of $ 131,739,791. III. Valuation Under Section 338 Election
An election under section 338 permits a corporate taxpayer that acquires another corporation (target) in a "qualified stock purchase" to step up the basis of all of the target's assets (other than cash and cash equivalents) to reflect the acquisition cost. This step-up is accomplished through a taxable deemed sale in which the (1) "old target" is treated as if it sold all of its assets at FMV in a complete liquidation on the acquisition date and (2) "new target" is treated as if it purchased all of the assets of the old target. Sec. 338(a). Section 338(b) provides that the basis of the assets after the deemed purchase consist of four elements, which the regulations call "adjusted grossed-up basis" (AGUB). Sec. 1.338- 4T(j)(1), Temporary Income Tax Regs., 50 Fed. Reg. 16402 *529 (Apr. 25, 1985). The rules for allocating AGUB to individual assets are contained in section 1.338(b)-2T, Temporary Income Tax Regs., 51 Fed. Reg. 3583 (Jan. 29, 1986); however, because of the date on which the Carnation acquisition occurred, petitioner was permitted to make a transitional election under section 1.338(b)-4T, Temporary Income Tax Regs., 51 Fed. Reg. 23737 (July 1, 1986), to use the allocation rules for lump-sum purchases. In general, lump-sum purchase prices are allocated by reference to the FMV of the individual assets. See Victor Meat Co. v. Commissioner, 52 T.C. 929 (1969); C.D. Johnson Lumber Corp. v. Commissioner, 12 T.C. 348 (1949). The dispute here concerns the valuation of, and thus the allocation of basis to, the inventory of Carnation, trademarks and trade names, unpatented technology, and goodwill and going concern. A. Inventory
For purposes of its December 28, 1985, income tax return, petitioner allocated $ 487 million to inventory based on the AAA appraisal. Based on the expert report and testimony of Stamos C. Nicholas (Nicholas), *530 petitioner now maintains that the FMV of the Carnation inventory as of January 10, 1985, was $ 509,837,000. In his report, Nicholas used the comparative sales method to value the inventory, because, pursuant to Rev. Proc. 77-12, 77-1 C.B. 569, which sets forth guidelines for lump-sum purchase price allocations, the comparative sales method is authorized for manufacturing operations. Respondent submitted the expert report and testimony of George H. Sorter (Sorter), in which Sorter, using the cost of reproduction method, determined that the value of the Carnation inventory was $ 413,564,000. Sorter also determined that, under the comparative sales method, the valuation of the inventory would not exceed $ 441,497,000. However, Sorter opined that the cost of reproduction method was a more appropriate method of valuation for the inventory than the comparative sales method because Carnation was not the type of manufacturing company that was described in Rev. Proc. 77-12, supra. Sorter maintained that Carnation was a material-intensive, rather than a conversion-intensive, *531 company because the merchandise bought for manufacture or sale component of cost of goods sold (ratio of purchases to cost of goods sold) was 76 percent in 1984 and 78 percent in 1983. Sorter's opinion is contrary to the record, which justifies treating Carnation as a manufacturer for purposes of valuing inventory. The record indicates that Carnation was primarily a manufacturing company. The Carnation Grocery Products Divisions manufactured raw foodstuffs into highly processed, consumer-ready food products. Other divisions of Carnation also carried on manufacturing operations. In addition, petitioner submitted the expert report and testimony of Irving H. Plotkin (Plotkin), in which Plotkin compared the Sorter ratio of purchases to cost of goods sold percentages of 76 and 78 percent to other manufacturing companies and determined that the Carnation ratios of purchases to cost of goods sold were similar to other manufacturing companies. Because we are satisfied that Carnation was a manufacturing company, we conclude that the comparative sales method is the appropriate method to value the Carnation inventory. Rev. Proc. 77-12, *532 supra at 569, states: The comparative sales method utilizes the actual or expected selling prices of finished goods to customers as a basis of determining fair market values of those finished goods. When the expected selling price is used as a basis for valuing finished goods inventory, consideration should be given to the time that would be required to dispose of this inventory, the expenses that would be expected to be incurred in such disposition, for example, all costs of disposition, applicable discounts (including those for quantity), sales commissions, and freight and shipping charges, and a profit commensurate with the amount of investment and degree of risk. * * *
Pursuant to Rev. Proc. 77-12, supra, Nicholas calculated the value of Carnation inventory as follows: Gross expected selling price $ 586,765,000 Cash discounts, price reductions,
and spoils
(61,711,000)
Disposal costs
(98,058,000)
Holding costs
(6,381,000)
Purchaser-reseller's profit
(12,091,000)
FMV of finished goods
408,524,000 Finished goods valued at book
5,039,000 Total finished goods
413,563,000 FMV of raw material
101,461,000 Significant adjustments
(5,187,000)
FMV $ 509,837,000 *533 Nicholas relied on the expert report of Gary E. Holdren (Holdren) for accounting and financial data that were necessary for purposes of determining the FMV of the inventory. Based on Carnation records and discussions with Carnation personnel, Nicholas and Holdren determined that, except for Contadina, Processed Potatoes Division, and Herff Jones, the number of units in the Carnation inventory on December 31, 1984, did not differ substantially from the number of units on January 10, 1985. The $ 5,187,000 negative adjustment in Nicholas' calculation includes an adjustment to reflect changes in inventory quantities between December 31, 1984, and January 10, 1985, for Contadina, Processed Potatoes Division, and Herff Jones. Nicholas attempted to determine the gross expected selling price at the product level. Holdren determined that there were no price lists and that there were insufficient company records to determine the prices for all products in inventory at the product level based solely on the company records. As a result, some of the product-level prices were based on a multiple-regression analysis of a sample of Carnation invoices. Respondent disputes several aspects of Nicholas' *534 report. In general, respondent contends that Nicholas' report, and thus petitioner's position, is inaccurate because it relies on estimates. Specifically, respondent contends that Nicholas' determination of inventory value is based on the December 31, 1984, inventory count, with some "adjustments" for certain divisions between December 31, 1984, and January 10, 1985. Respondent contends that petitioner cannot meet its burden of proof because it cannot document the number of units, or their prices, on hand on January 10, 1985. Respondent cites Curtis Noll Corp. v. Commissioner, T.C. Memo. 1982-363, affd. without published opinion 734 F.2d 13 (6th Cir. 1984), in which the taxpayer was attempting to establish the value of inventory acquired on September 30, 1973, based on a physical count made on May 19, 1973. There, we held that the calculations were "fraught with too many uncertainties, estimations and inaccuracies to be accepted by us". Id. Here, in contrast, the gap is only 10 days, which includes at least 3 nonbusiness days, and it is unlikely that significant changes in inventory occurred during these 10 days. Moreover, *535 the notice of deficiency did not raise the 10-day gap issue. We conclude that the 10-day gap is not fatal to petitioner's satisfying its burden of proof. The calculations contained in the Nicholas report are based on a detailed analysis conducted at the product level. Because of the level of the analysis in the Nicholas report, we conclude that it, in contrast to the Sorter report, is an appropriate starting point from which to determine the FMV of the inventory as of January 10, 1985. At trial, the parties attempted to narrow the issues in dispute; in furtherance of this objective, respondent submitted a schedule prepared by Sorter that made adjustments to Nicholas' calculation of inventory value as follows: FMV per Nicholas $ 509,837,000 1. Correct disposal costs
(37,303,000)
2. Holding costs on accounts receivable
( 4,726,000)
3. W.I.P-Gross margin on assumed cost
to complete
( 6,224,000)
4. Remove Herff Jones sample rings
( 866,000)
5. Health and nutrition finished goods
( 1,612,000)
6. Profit to purchaser-reseller
(12,091,000)
Corrected FMV $ 447,015,000 At oral argument on the inventory issue, respondent stated to the Court that Sorter's schedule "lays *536 out the differences for * * * [the Court] to decide basically. You just have to go down the line and decide what you are going to do with the issues. We think they are relatively fairly presented." We informed the parties as to our thoughts and concerns as to each point in respondent's schedule, and the parties were directed to focus their arguments in the briefs on such concerns. Nevertheless, in her briefs, respondent ignores the prior schedule and proposes the following adjustments to the Nicholas schedule: FMV per Nicholas $ 509,837,000 Less: Expected selling price
(21,651,000)   Holding costs
( 4,726,000)   Intangibles' cost
(19,480,000)   SG&A costs
( 22,782,000)   Return on investment
( 4,601,000)
Corrected FMV $ 436,597,000 Because of the inherent uncertainties in this process and the necessity of narrowing the areas of dispute, we conclude that it is fair to treat the schedule presented at trial by respondent as an admission and to use $ 447 million as the minimum value of the inventory. Respondent's "expected selling price" adjustment of $ 21,651,000 is the difference between Nicholas' expected selling price of $ 586,765,000 and *537 gross sales of $ 565,114,000 computed by AAA and used for petitioner's return position. While Nicholas' use of estimates is not fatal to petitioner's position, they are subject to particular scrutiny here. The computed FMV of the inventory at trial exceeded the FMV reported on the return by over $ 22 million. The return is an admission that can be overcome only by cogent proof. Estate of Hall v. Commissioner, 92 T.C. 312, 337-338 (1989). In our view, the use of estimates in this case is inadequate to overcome the admission. We conclude that Nicholas' calculation must be reduced in order to reflect petitioner's return position. Respondent's proposed "expected selling price" adjustment approximates this reduction, and we therefore adopt it. The parties appear to agree that, under the comparative sales method, it is assumed that both the buyer and seller remain a going concern and that the inventory is valued under "the theory that it may be sold to a hypothetical willing buyer having facilities equal to that of the seller for distributing it at retail." Knapp King-Size Corp. v. United States, 208 Ct. Cl. 533, 527 F.2d 1392, 1402 (1975). *538 Under that theory: Such a willing buyer would not be agreeable to paying the full retail price if he knew that he must incur a loss because there had been no allowance for his cost of disposition. Nor would he be willing to pay a price that would merely return his investment without compensating him for the risks which he must incur during the time it took to make the retail sale and for his loss of opportunity to make profits in other ways during the same period on the amount of his investment. Conversely, the willing seller of inventory for a lump sum could hardly expect to receive as much as the aggregate retail price if he was thereby enabled to shift the burden of the disposition costs and risks which would exist during the period of retail sale and if he could invest the proceeds in equally profitable investment or activities elsewhere. [Id.]
The parties also agree that, to compute the FMV of the inventory under the comparative sales method, the expected sales price should be reduced by disposal costs, holding costs, and a profit allowance; however, the parties dispute the correct amounts of those reductions. 1. Disposal Costs
The main item disputed by the *539 parties accounting for over $ 42 million is the calculation of the disposal costs that the willing buyer of the inventory would incur. Nicholas uses $ 98,058,000. Respondent includes in its adjustment of Nicholas' disposal costs certain selling, general, and administrative expenses of $ 22,782,000 (SG&A expenses) and an intangibles' charge of $ 19,480,000. a. SG&A Expenses
In general, the dispute on disposal costs relates to whether disposition costs include all selling-related costs that would be incurred by the buyer during the disposition period or a lesser amount based on the specific selling-related functions remaining to be performed with respect to the acquired inventory. Nicholas and Holdren determined that the costs that should be treated as disposal costs include only those costs that the purchaser-reseller would expect to incur with respect to the individual units of acquired inventory. As a result, Nicholas did not include all of the Carnation historical SG&A expenses related to inventory as disposal costs. Nicholas reviewed the functions that would have to be performed by "New Carnation" in disposing of the inventory. Nicholas treated as disposal costs the portion *540 of historical SG&A expenses that would relate to the functions actually remaining to be performed by New Carnation with respect to the inventory existing as of January 10, 1985. In contrast, Sorter did not analyze the extent to which "Old Carnation" had already incurred SG&A expenses associated with inventory before January 10, 1985. Instead, Sorter calculated the total Carnation 1984 SG&A expense as a percentage of 1984 net sales and then applied this percentage to his estimated net selling price of finished goods inventory. The effect of Sorter's computation was to treat all SG&A expenses associated with inventory as disposal costs, irrespective of the functions performed with respect to existing inventory before January 10, 1985. Respondent contends that Nicholas' approach ignores expenses that the buyer (New Carnation) would have to incur in order to continue as a viable business. Respondent argues that Nicholas attempted to limit disposal costs by pinpointing, for each item, the estimated remaining expenses needed to place that item with a customer and that, in doing so, he excluded ongoing promotional efforts and similar going concern expenses. Respondent argues that, in order *541 to sell at going concern prices, which Nicholas used to calculate the expected sales price, New Carnation would have to incur all going concern expenses. Respondent argues that Nicholas' incremental expenses would be the true disposal costs only if the buyer were to liquidate. Respondent contends that a going concern-based expected sales price and liquidation-based SG&A expenses calculations are inconsistent and contrary to Knapp King-Size Corp. v. United States, supra, and Zeropack Co. v. Commissioner, T.C. Memo. 1983-652, affd. without published opinion (4th Cir. 1985). Respondent contends that those cases support respondent's position that disposition costs should be determined based on total period costs, not by reference to specific inventory items. Petitioner, on the other hand, contends that, if the "already incurred expenses" are included as disposal costs and thus as a reduction from the price that the seller (Old Carnation) receives, Old Carnation would not recover its costs incurred on the inventory and thus would not make a profit from the sale of that inventory. Petitioner argues that a *542 sale in which the seller does not recover its expenses is inconsistent with the going concern assumption. Because the focus here is on the net costs that the buyer (New Carnation) is relieved of, to some extent, we agree with both parties. On the one hand, we agree with petitioner that, to the extent that the seller (Old Carnation) has performed certain selling functions, the purchaser (New Carnation) is relieved of the related expenses. For example, with respect to the Grocery Products Divisions, to the extent that inventory had been shipped from plants to distribution centers as of January 10, 1985, New Carnation was relieved of the related freight cost because it would not have to ship that inventory to the distribution centers in 1985. We believe that Sorter's analysis does not take these costs into account. On the other hand, even though Old Carnation performed certain other selling functions prior to January 10, 1985, New Carnation would not be relieved of those related expenses. For example, although Old Carnation incurred costs to advertise Carnation goods in 1984, New Carnation, as a going concern, would not be relieved of the advertising function and thus would likewise *543 incur similar advertising expenses. This distinction is omitted from Nicholas' calculation and underlies respondent's current objection to it. In this context, the distinction between the expenses at issue is that some, such as freight, are variable expenses that vary with the level of inventory manufactured and some, such as advertising, are generally fixed expenses that, irrespective of the level of production, do not vary in total. Irrespective of the variable/fixed distinction, these selling and distribution expenses are generally considered period expenses that relate to a particular year, not to a specific unit of inventory, and thus are not allocated to inventory but instead are deducted and recovered against period income. See sec. 1.263A-1(e)(3)(iii), Income Tax Regs.; see also Accounting Research Bulletin No. 43 (stating that selling expenses constitute no part of inventory costs). As a result, to the extent that Old Carnation incurred these period expenses in 1984, Old Carnation presumably would have deducted and recovered such expenses from 1984 income. Accordingly, such expenditures are not properly allocable to inventory sold in 1985. Petitioner argues that many disposition *544 period costs relate not to the valued inventory but to newly manufactured inventory and will be recovered by selling this new inventory. Petitioner argues that what must be matched is the cost to the valued inventory, not the cost to the period. In contending that disposal costs should not include any of the already incurred expenses, petitioner effectively seeks reimbursement of expenses for Old Carnation that were related to sales made in 1984. However, the cases cited by petitioner indicate that the SG&A costs that are properly included as disposal costs include those disposition-related costs that the seller will incur during the disposition period, without regard to the fixed costs incurred by the seller in a prior year. In Zeropack Co. v. Commissioner, T.C. Memo. 1983-652, we considered an expert's valuation of frozen fruit inventory. There, the expert calculated that the seller-company incurred selling and administrative expenses of 10.4 percent of annual sales. To arrive at the price that a buyer would pay for the inventory, the expert subtracted from the expected sales price amount a profit amount and 10.4 percent, which represented the estimated *545 operating and sales expenses that the purchaser would incur. We concluded that the reduction of 10.4 percent for sales and operating expenses was high because the hypothetical sale was taking place at mid-year and, thus, the buyer would only incur a prorated portion of the yearly 10.4 percent amount; the seller undoubtedly incurred a pro rata portion of the 10.4 percent during the portion of the year that it held the inventory. Despite the high estimate for expenses, we did not reduce the expert's valuation because we also concluded that the expert's low allowance for the buyer's profit offset the high expenses estimate. In Knapp King-Size Corp. v. United States, supra, the method of calculating the disposal costs was not discussed; however, the Court of Claims increased the disposal cost amount to account for a pro rata portion of the warehouse expenses and other costs related to disposition that would be incurred by the buyer during the portion of the year that it held the inventory. Neither case made any reduction in disposal costs for amounts incurred by the seller in a prior year. Here, the hypothetical sale occurred on January *546 10, 1985, and, thus, in contrast to Zeropack Co. and Knapp King-Size Corp., the sale here does not involve a mid-year proration of 1985 fixed expenses. As a result, the amounts allocated to disposal costs for New Carnation should include the full-year portion of fixed inventory-related SG&A expenses. However, to the extent that Old Carnation incurred variable expenses related to the acquired inventory, the total amount of 1985 period expenses would be reduced for New Carnation. Accordingly, it is appropriate to reduce disposal costs by the amount of variable expenses incurred by Old Carnation with respect to the acquired inventory. At trial, petitioner introduced an exhibit prepared by Holdren that identified the costs that were excluded as disposal costs because they were determined as not having to be incurred by the purchaser. In this exhibit, Holdren listed total expenses not incurred by the purchaser-reseller of $ 44,707,000. Of that amount, $ 22,782,000 consisted of selling and general expenses including, among other things, advertising, publicity, salaries, and payroll taxes; $ 21,925,000 consisted of a category of expenses called "Expenses Incurred by Manufacturer *547 at 12/31/84", which included expenses such as freight, warehousing, and shipping labor. We conclude that these costs of $ 21,925,000 are variable costs that would not be included in the purchaser's disposal costs. For lack of better evidence, we conclude that the selling and general expenses of $ 22,782,000 represent the portion of fixed costs that were excluded from disposal costs by Nicholas but should be included as disposal costs because such costs would be incurred by New Carnation during the disposition period. As a result, we agree with respondent's position on brief that disposal costs, as computed by Nicholas, must be increased by $ 22,782,000. b. Intangibles' Charge
Respondent contends that a further adjustment to Nicholas' calculation of disposal costs is required in order to prevent an increase in inventory value for amounts that are allocable to certain intangible assets. Respondent maintains that the gross expected sales price, which is the starting point for the comparative sales method, represents the price for the inventory sold as part of a going concern and includes higher prices attributable to brand names and other intangible assets. Respondent argues that, *548 to value correctly the Carnation inventory, we must reduce the expected selling price by the portion of the price that is attributable to these intangible assets. Citing United States v. Cornish, 348 F.2d 175 (9th Cir. 1965), respondent contends that a failure to make this reduction will result in a double counting of intangible asset value. Respondent fails to take into account the difference, for valuation purposes, between finished and unfinished inventory. United States v. Cornish, supra, involved the valuation of the assets of a sawmill, including timber and timber-cutting rights owned by the sawmill. The timber and timber-cutting rights were essentially work in process and raw materials in a context where, because of "unique sawmills", a higher quantity and quality of lumber could be processed prospectively. The taxpayers there sought to value the timber under a "work back" formula that began with the estimated sales amount that the sawmill could expect from the timber and was reduced by certain expenses and an anticipated manufacturing profit. The Court of Appeals for the Ninth Circuit rejected that formula, *549 stating that it -- takes into account the prospect that the partnership would get more and better timber out of a given tree than most other sawmills. This prospective "overrun," as it was called, was largely attributed to the unique sawmills which were built as a result of the special skills and abilities of the selling partners. But this prospect already would be taken into account, under the views expressed in this opinion, in determining the fair market value of the sawmills. Were it again taken into account in valuing the timber which it was known would go through these mills, the same element of value would unjustifiably do double duty. [Id. at 183.]
The Court there was concerned with the double counting that could result from allowing an addition to value for both the sawmills and the unprocessed timber for essentially the same thing: the benefit of future processing by unique sawmills. Here, we are not persuaded that there has been any double counting with respect to the unfinished inventory that would require future processing. In his report, Nicholas stated: "Work-in-process should be valued in the same manner as finished goods *550 except that the cost to complete the goods and its associated profit should be subtracted from the Net Expected Selling Price in arriving at fair market value". By subtracting from the net expected selling price the cost to complete and associated profit, Nicholas eliminated from the value of the inventory any value that could be attributed to the intangible assets of Carnation; by making these reductions to net expected selling price, Nicholas' computation was conservative in that, effectively, the work in process was valued somewhere close to cost. Cf. Reliable Steel Fabricators, Inc. v. Commissioner, T.C. Memo. 1995-293 (FMV of work in process is higher than replacement cost because replacement cost allocates no profit to seller). With respect to the finished inventory, we are not persuaded that the reasoning of Cornish applies. Although the Court of Appeals for the Ninth Circuit implied, in a footnote, that its reasoning would also apply to the valuation of finished inventory, the implications of this suggestion were not clear. In Jack Daniel Distillery v. United States, 180 Ct. Cl. 308, 379 F.2d 569, 578 (1967), *551 the Court of Claims distinguished Cornish and held its holding inapplicable to the valuation of a branded product, the manufacture of which is substantially complete. The Court stated: In the ordinary commercial situation, when an item is manufactured and put into inventory, it is ready to be sold to the consuming public. If it is a unique item, the value attributable to a name or trademark will have adhered to the item at that point in time. For example, a Cadillac automobile or a Baldwin piano has a certain value when produced, and the value of the name would be virtually inseparable from the value of the item as a whole. [Jack Daniel Distillery v. United States, supra at 575.]
The intangible assets of Carnation have value to the extent that they can be expected to enable the production of unique brand name inventory in the future. United States v. Cornish, supra at 183. However, whatever value the intangible assets of Carnation have the potential to add to inventory, that value has already been added to the finished inventory as of the time it is ready for sale; this value, once added, *552 is inseparable from the finished product. The finished inventory here has been made more valuable because of the Carnation intangible assets and, in calculating the price that a willing buyer would pay for such inventory, it is appropriate to reflect such value. See Zeropack Co. v. Commissioner, T.C. Memo. 1983-652 (using list prices of branded frozen fruit products). Respondent has cited no authority under which the value of finished goods inventory was reduced to account for intangible asset value. We hold that no adjustment to Nicholas' computation for an intangibles' charge is required. 2. Holding Costs
To compute holding costs, Nicholas determined the average amount invested in holding the inventory, the average period that the inventory was held for each division, and a finance rate. Nicholas opined that the appropriate finance rate was "the rate at which companies that were likely purchasers of the inventory would have been able to obtain financing for the period of time that would reasonably be expected to be necessary to dispose of the inventory". Nicholas determined that the average holding period for Carnation inventory was 61 days, *553 and thus he used a short-term borrowing rate of 8.25 percent. Respondent seeks to increase holding costs by $ 4,726,000 by making two adjustments to Nicholas' calculation: (1) Using a 30-year Treasury Bond rate of 11.875 percent as opposed to a short-term borrowing rate and (2) tacking onto the holding period the collection period for the accounts receivable arising from the sale of inventory. In his report, Sorter used an 11.875-percent rate but specifically stated that he was not offering an opinion as to the correctness of this rate. Respondent contends that the long-term 11.875-percent rate is the appropriate finance rate because inventory is a perpetual asset that a going concern continuously replenishes and, thus, the funding for the inventory must last indefinitely. Respondent's attempt to justify the 11.875-percent rate is misplaced. The deduction for holding costs is not made to reflect an adjustment for the financing of all future inventory. See Rev. Proc. 77-12, 1977-1 C.B. 569. The experts of petitioner and respondent have calculated the holding period as 61 and 91 days, respectively, clearly "short term". We conclude *554 that the short-term rate used by Nicholas is reasonable. Respondent's argument to increase the holding period to reflect the accounts receivable collection period is not consistent with Rev. Proc. 77-12, supra. The adjustment for holding costs is made to account for the period between the acquisition of the inventory at issue and its disposition, not the period between acquisition and actual receipt of cash. Rev. Proc. 77-12, supra at 569 ("consideration should be given to the time that would be required to dispose of this inventory" (emphasis added)). In any event, we are not persuaded that an additional adjustment is required to reflect the form of payment that results from the sale of inventory; rather, the appropriate discount is based on the period of time necessary to convert the inventory to a liquid asset (either cash or account receivable). See, e.g., Calder v. Commissioner, 85 T.C. 713, 722-725 (1985) (relevant inquiry in calculation of blockage discount for artwork is the length of time necessary to liquidate the artwork, *555 without inquiry into manner of payment); see also Estate of O'Keeffe v. Commissioner, T.C. Memo. 1992-210 (no inquiry into form of payment). Accordingly, we hold that no adjustment to Nicholas' calculation of holding costs is required. 3. Profit
The parties agree that the expected selling price must be reduced by a certain amount so that the buyer of the inventory would be able to earn a profit on the resale of the inventory. Respondent, however, contends that the profit allowance for the purchaser that was calculated by Nicholas is too low and that Nicholas' calculation must be reduced by $ 4,601,000. Nicholas determined the profit allowance for the purchaser-reseller based on the following formula: Adjusted expected operating profit x Purchaser-reseller's disposal cost + Purchaser-reseller's holding cost / Total costs Nicholas determined the total expected operating profit on a product line or operating unit basis based on the historical operating profit of Carnation. Nicholas reduced the total expected operating profit by the total holding cost for both the seller and purchaser to arrive at the adjusted expected operating profit. Under *556 the formula, the portion of the adjusted expected operating profit that was allocated to the purchaser was based on the purchaser's proportionate share of the total cost incurred and expected to be incurred in connection with the manufacture and sale of the inventory. Using this formula, Nicholas determined that $ 12,091,000 of profit should be allocated to the purchaser-reseller. In contrast, Sorter determined the purchaser-reseller's profit allowance by discounting the inventory FMV, as determined by him, by a 5-percent "Expected Return on Investment". At trial, Sorter testified that he believed that the inventory turnover of Carnation was 4 times per year and, thus, that the 5 percent annualized would be 20 percent, which he thought was a reasonable return on assets. Sorter testified that he examined the Carnation financial statements for 1982 through 1984 and that the return on assets for 1982 and 1983 was in excess of 20 percent, but below 20 percent in 1984. Sorter further testified that his 5-percent rate was not based on objective economic data involving marketplace transactions or specific companies. Respondent contends that the 5-percent return, when applied to finished *557 goods inventory by Sorter, exceeds Nicholas' profit allocation by $ 4,601,000 and, thus, that Nicholas' computation of FMV should be reduced by this amount. Sorter's 5-percent rate is not supported by the record and, apparently, is based mostly on Sorter's subjective belief that it was a reasonable rate. Sorter's profit calculation is not reliable and does not support an adjustment to Nicholas' calculation. Nicholas' calculation allocates approximately 74 percent of the profit to Old Carnation, the manufacturer, and approximately 26 percent of the profit to New Carnation, the purchaser-reseller. Petitioner contends that Nicholas' profit allocation is reasonable because the allocation of profit in proportion to costs recognizes that the manufacturer, which imparts the greater value, assumes greater risks and thus must make a larger profit than the reseller. Petitioner contends that similar allocations were made in Knapp King-Size Corp. v. United States, 208 Ct. Cl. 533, 527 F.2d 1392 (1975), and Zeropack Co. v. Commissioner, T.C. Memo. 1983-652. Respondent does not dispute Nicholas' allocation formula per *558 se but contends that his profit allocation must be adjusted to reflect his improper calculation of expected selling price and disposal costs. Respondent also contends that the 74/26-percent split is unreasonable because it does not allocate enough profit to the marketing and sales functions performed by New Carnation. We have adjusted Nicholas' calculation of disposal costs; as a result, we agree that an adjustment to Nicholas' profit calculation is required. Under Nicholas' formula, an increase in the amount of disposal costs results in a greater profit allocation to the purchaser-reseller. We have added $ 22,782,000 to the disposal cost amount, which represents an increase of approximately 23 percent to the Nicholas disposal cost amount. To account for this adjustment, we conclude that the $ 12,091,000 profit that Nicholas allocated to the purchaser-reseller should be increased by 23 percent, which would result in a profit allocation of $ 14,871,930 and a $ 2,780,930 adjustment to Nicholas' calculation of FMV. We are satisfied that this adjustment results in a profit allocation that compensates the purchaser-reseller adequately for its risk and marketing and distribution efforts. *559 In summary, we agree with the adjustments proposed by respondent to Nicholas' calculation of inventory FMV to the following extent: Nicholas FMV
$ 509,837,000 Expected selling price adjustment
(21,651,000)
Disposal cost adjustment
(22,780,000)
Profit adjustment
(2,780,930)
Adjusted FMV
$ 462,625,070 4. Test of Reasonableness
As a test of reasonableness, both parties calculated the FMV of the inventory under a build-up method. The build-up method views the sale of inventory from the seller's perspective by calculating the price for which a seller would sell the inventory. The parties generally agree that the seller would accept a price that is based on the cost of the inventory plus a profit; the parties disagree, however, as to the costs that should be recovered by the seller and the appropriate profit. Respondent contends that Old Carnation had an inventory cost of $ 413,564,000 (the book value of inventory) and had a 13.56-percent historic operating profit. As a result, respondent contends that Old Carnation, as the seller, would ask no more than $ 413 million plus some part of 13.56 percent, or $ 444,202,333. Respondent's 13.56-percent rate is a rate that *560 was calculated by Sorter as the "net profit before tax". Petitioner contends that this net profit rate is not the proper rate to use in the calculation of return on inventory. Petitioner contends that the appropriate rate is the Carnation 1984 ratio of operating profit to cost of goods sold; petitioner argues that this rate should be used to calculate the proper return on inventory because operating profit includes the profit generated by conducting the business. Petitioner claims that the operating profit to cost of goods sold ratio is 17 percent, which was derived by eliminating nonrecurring acquisition costs from operating profit. On brief, respondent makes no argument in support of its 13.56-percent net profit before tax rate or against petitioner's 17-percent operating profit rate. We are persuaded that the ratio of operating profit to cost of goods sold is a reasonable measure, and, thus, we conclude that 17 percent is the appropriate rate to use in the build-up method. On brief, petitioner submitted a calculation under the build-up method resulting in a value of $ 492,524. Respondent submitted a "corrected" version of petitioner's calculation, which determined a $ 426,347,000 *561 value for the inventory. The main disputes between the parties on this issue relate to whether the seller should receive a return of the previously incurred expenses and to the proper profit split. With respect to the previously incurred expenses, respondent argues that, under proper tax accounting, any expenses related to the inventory are included in inventory book value and any expenses not included in inventory are written-off. Respondent argues that the seller would require reimbursement only for costs not written-off, namely the inventory book value. Citing Knapp King-Size Corp. v. United States, 527 F.2d at 1401, respondent argues that allowing an increase to inventory value for amounts that were previously deducted by Old Carnation results in "the practical equivalent of a double deduction". Respondent overlooks that, in Knapp King-Size Corp. v. United States, after noting the "equivalent of double deduction", the Court stated: "It is precisely for these reasons that in the context of such a valuation it becomes necessary to set up a hypothetical willing buyer and willing seller to reconstruct fair value as of the particular *562 date." Id. In discussing the willing seller/willing buyer standard, the Court stated: the hypothetical willing seller here might be expected to demand a price for the inventory which would compensate him not only for the current cost of its replacement but also would give him a fair return on his expenditures over a period of several months in accumulating and preparing the inventory for distribution. Conversely, the purchaser would have to take into account that his purchase price would include the benefit of the seller's prior expertise in planning, designing and getting ready to promote and facilitate the sale of the merchandise at a profit in the near future and would expect to pay for that together with a fair return on it. [Id. at 1400-1401; emphasis added.]
Under this standard, we believe that Old Carnation would demand a price that would take into account the variable expenses, such as freight, that it had already incurred. As we have discussed, Old Carnation, by incurring these expenses, relieved New Carnation of the burden of having to incur such expenses. It is reasonable that New Carnation would expect to pay for being relieved of such expenses. In *563 calculating disposal costs, we noted that $ 21,925,000 of the already incurred expenses as calculated by petitioner consisted of variable expenses such as freight. We conclude that a willing seller would require reimbursement of, and that a willing buyer could expect to pay for, $ 21,925,000 of expenses. Respondent also argues that the already incurred expenses were incurred and thus accrued as an expense and account payable by Old Carnation but actually paid by New Carnation. Respondent argues that New Carnation would assume the accounts payable and eventually would have to pay such accounts and, thus, that New Carnation should not be reimbursed for such expenses. In a hypothetical sale, however, the amount of any accounts payable assumed by the purchaser would not affect the overall purchase price but would reduce the amount of cash paid to the buyer; the purchase price is not affected by the form of the payment, whether made by cash or by part cash and part assumption of liabilities. See Fisher Co's. v. Commissioner, 84 T.C. 1319, 1347-1348 (1985), affd. without published opinion 806 F.2d 263 (9th Cir. 1986). Respondent *564 also argues that Old Carnation did not actually "incur" the full amount of the already incurred expenses because it received the benefit of a tax deduction for such expenses in the prior year. This argument is without merit. The build-up calculation uses pretax amounts. Because the seller in a willing buyer/willing seller transaction will, generally, be taxed on the excess of the amount received over basis, the seller must receive a pretax amount; otherwise, the seller would bear the tax burden twice. With respect to the parties' profit-split dispute, we agree with respondent that petitioner's 25-percent split does not allocate an adequate profit to the marketing and distribution functions remaining to be performed by New Carnation. At a minimum, we believe that one-third is a reasonable profit allocation to New Carnation. To account for the foregoing, we adjust respondent's "correction" to petitioner's build-up method as follows: Respondent's corrected cost
of finished goods $ 308,098,000 Plus: Profit   (17% x 308,098,000)
52,376,660 FMV of finished goods
360,474,660 Plus: Raw materials at cost
100,055,000    Herff Jones gold
2,789,000 Plus: Variable expenses incurred   by seller/manufacturer
21,925,000 Less: Profit to New Carnation   (1/3 x 52,376,660)
(17,458,885)
FMV of inventory
$ 467,784,775 *565 Nicholas' computation, as adjusted, is within the range of reasonableness, as adjusted. We hold that the FMV of the Carnation inventory on January 10, 1985, is $ 462,625,070. B. Trademarks and Trade Names
The parties dispute the value of certain U.S. and Canadian trademarks and trade names owned by Carnation at the time of acquisition; petitioner maintains that the trademarks and trade names in dispute have a value of $ 346 million, and respondent maintains that such trademarks and trade names have a value of $ 146,100,000. The core of the dispute involves the proper valuation method and its application. Both parties submitted expert reports that valued the trademarks and trade names using several variants of a hypothetical licensor/licensee model, each based on the assumption that the trademark and trade name value may be calculated by determining the present value of the royalty stream that a licensee would have to pay a licensor in order to obtain a license for the trademark. 1. Petitioner's Expert Report
Petitioner submitted the expert report of Robert F. Reilly (Reilly), in which Reilly computed the value of the trademarks and trade names in dispute under the profit-split *566 method, the selling price differential method, the econometric method, and the relief from royalty method. Each of Reilly's methods valued the trademarks and trade names at, or in excess of, $ 340 million. Reilly used the profit-split method as his principal valuation method. a. Profit-Split Method
Reilly's profit-split method was based on the division of the after-tax operating margin that a licensee would be willing to pay, after taxes, to a hypothetical licensor for the use of a trademark or trade name. Reilly determined that, through the payment of a royalty, the licensee would be willing to pay a "split" of its after-tax profit to the licensor because the use of the trademark or trade name would increase its after-tax operating profits. Reilly estimated the percentage split of the adjusted after-tax operating profit that the licensee would be willing to pay the licensor based on recent cases from this Court that involved royalty fees paid to licensors for the use of trademarks and trade names and also on the qualitative attributes of the individual trademarks and trade names based on whether such trademarks were general or limited market recognition trademarks. Reilly's *567 calculations under the profit-split method are not sufficiently grounded on facts in this record; his percentage split was based on royalty rates that were determined under specific factual circumstances in other cases, Bausch & Lomb v. Commissioner, 92 T.C. 525 (1989), affd. 933 F.2d 1084 (2d Cir. 1991) (contact lens-manufacturing intangibles); Sundstrand Corp. v. Commissioner, 96 T.C. 226 (1991) (airplane technology-manufacturing intangibles); Ciba-Geigy Corp. v. Commissioner, 85 T.C. 172 (1985) (chemical manufacturing intangibles), not on comparable profit-split agreements or any substantial objective evidence. We have serious reservations about using the results of other cases as the basis for expert testimony. An expert is useful if and because he or she brings independent evidence to the Court. A survey of opinions, by contrast, suggests that the witness is simply relying on "what the traffic will bear." Any new opinion based on factual evidence is likely to change the average--which thus is not a reliable indicator of value in other cases. Value should be *568 based on the market, not on the case law. See Estate of Pillsbury v. Commissioner, T.C. Memo. 1992-425. On brief, petitioner cites intangible licensing literature and license agreements in the record to claim that profit-split agreements are widespread in the food industry. The license agreements relied by petitioner are 1990 agreements and do not demonstrate that the profit-split method was appropriate for a 1985 acquisition. Further, testimony by respondent's experts indicates that royalties based on profit splits were not widespread. In any event, petitioner has not demonstrated that the cited agreements or examples in articles are comparable to the portfolio of Carnation trademarks; one of the agreements cited by petitioner was for a premium product, while the other was a license agreement for technology, not for the use of a trademark or trade name. In sum, the record here does not provide us with an adequate basis on which to evaluate Reilly's profit-split calculations. Accordingly, we do not accept Reilly's profit-split calculations. See Perkin-Elmer Corp. v. Commissioner, T.C. Memo. 1993-414. b. Selling-Price-Differential *569 Method
As a corroborative method, Reilly calculated the value of the trademarks and trade names under the selling-price-differential method, which purportedly determines the incremental price differential attributable to Carnation trademarks and trade names over unbranded products and then splits the premium price between the hypothetical licensor and licensee. Reilly estimated the split of the selling price differential based on recent cases of this Court and on the qualitative attributes of the individual trademarks and trade names. At the outset, Reilly recognized a flaw associated with this method, stating in his report: "We have not chosen the selling price differential split as our primary method because of the difficulty in isolating only that portion of the selling price differential that is due the owner of the trademark or trade name." Like Reilly's calculations under the profit-split method, his calculations under the selling-price-differential method are not adequately supported, or capable of verification, by the record here. We do not accept Reilly's selling-price-differential method calculations. c. Econometric Method
In his report, Reilly reviewed the report *570 of Jeffrey A. Dubin (Dubin), which was based upon principles of econometrics to derive implied economic values for the trademarks expressed as percentages of net sales. Although petitioner cites several cases in which the validity of regression analyses have been recognized, it also notes that the econometric method produced FMV's significantly in excess of Reilly's values. It appears that petitioner relies on the econometric method only as a corroboration of Reilly's other methods. In any event, we are not satisfied that the econometric method is the appropriate valuation method here or that it is entitled to any significant weight. d. Relief-from-Royalty Method
Under the relief-from-royalty method, Reilly determined the appropriate royalty rate based on an investigation of third-party license agreements. Reilly researched various public data bases and marketing and licensing publications; contacted various food industry executives concerning licensing fees for similar products; and was provided with licensing agreements entered into by Carnation and Nestle and certain other licensing arrangements for which necessary consents were obtained. Reilly concluded that there was insufficient *571 information to select specific royalty rates for individual trademarks based on exact comparables. Because his task was to determine the aggregate value of the trademarks in order to determine their basis in a sale in which all were transferred together, Reilly applied an aggregate royalty rate to the trademarks and trade names. From the available data, Reilly estimated a royalty rate range of 1 to 5 percent for the Carnation trademarks and trade names and, based on this range and on his assessment of the overall nature and quality of the Carnation trademarks, Reilly determined that a 4-percent royalty was fair for purposes of valuing all of Carnation's trademarks and trade names in the aggregate. 2. Respondent's Experts: Relief-from-Royalty Method
Respondent submitted the expert report of Steven Schwartz (Schwartz), in which Schwartz determined that, under the relief-from-royalty method, the trademarks and trade names had a value between $ 131,643,000 and $ 150,321,000. Respondent relies mainly on the report of Keith Reams (Reams), in which Reams valued the trademarks and trade names under the relief-from-royalty method. In contrast to Reilly, Reams sought to apply the relief-from-royalty *572 method to each individual trademark and trade name. To do so, Reams used three steps: (1) Determining the projected excess earnings for each product line, (2) selecting an appropriate royalty rate for each trademark and trade name, and (3) computing the present value of the royalty payments. Reams determined that the trademarks and trade names had a value of $ 146,100,000. Reams used the first step, determination of excess earnings, as a yardstick to measure the presence or absence of intangible and trademark/trade name value in each product line. Reams' excess earnings amount represented the earnings for a particular branded product, after taking into account a return on the other assets of the company (excluding trademarks/trade names and goodwill) and, thus, measured the contribution of the trademark/trade name and goodwill to earnings; in other words, Reams' excess earnings analysis sought to isolate the portion of the profit attributable to the trademarks/trade names and goodwill. Reams computed the average projected excess returns based on management projections contained in the 1985 long-term plan. Reams determined positive excess returns for several of the Carnation products, *573 including Coffee-mate, Instant Breakfast, Hot Cocoa Mix, Chef-Mate Entrees, Mighty Dog, Fancy Feast, and Chef's Blend, and he determined minimal or negative excess returns for commodity-type products, such as dairies and ice cream, Evaporated Milk, Contadina, and Buffet Cat Food. In the second step, Reams reviewed information regarding comparable licenses of trademarks and trade names. Reams determined that typical licensing arrangements in the food industry had royalty rates in the range of 0 to 5 percent. Reams then divided the product lines into two categories: those with excess returns and those without excess returns. For the products without excess returns, Reams selected a royalty rate from the lower end of the comparable royalty rates, which was between 0 and 1 percent. For the products with an excess return, Reams assigned a royalty rate in the range of 1 to 5 percent, with 5 percent reserved for exceptional products such as Coffee-mate and Carnation Instant Breakfast. Petitioner makes several arguments in opposition to Reams' application of the relief-from-royalty method. First, petitioner contends that, although Reams appears to identify specific royalties for specific *574 Carnation trademarks and trade names, the process by which he assigns the royalty rates is one of subjective judgment based on data that only provide a range of possible royalties. Thus, petitioner contends that Reams' application of the relief-from-royalty method is not different or preferable to the application by Reilly. We disagree with petitioner. Although Reams' selection of royalty rates does involve an element of subjective judgment, it also involves, through the excess return calculation, a more objective screening device by which individual trademarks and trade names can be matched with appropriate rates. Given the range of royalty rates in this record, such individual determination is preferable to an aggregate rate, which is entirely subjective. Petitioner also contends that Reams' application of the relief-from-royalty method contains a major conceptual error, namely, the omission of goodwill value from trademark value. Petitioner makes this argument in two different respects. First, petitioner contends that Reams did not include any amount of goodwill in the trademark/trade name value because, according to petitioner, Reams mistakenly thought that he was required to *575 carve out goodwill value from trademark/trade name value. As such, petitioner contends that Reams' calculations are inconsistent with trademark law, which provides that a trademark may be sold or assigned only with the goodwill of the business in which the trademark is used, 15 U.S.C. sec. 1060 (1982), and case law that has noted that trademark value is inextricably related to goodwill. Secondly, petitioner argues that the trademark FMV (the price that a willing buyer would pay a willing seller) must include all of the value of the goodwill embodied in, and necessarily sold as part of, the trademark. In the case of a trademark license agreement, petitioner argues that the licensor would be required to retain legal ownership of the goodwill associated with the trademark, or else the purported license would constitute a sale or assignment. Therefore, petitioner argues that royalties paid under a license agreement, unlike the price paid in a sale, cannot include consideration for all of the ownership rights reserved to the licensor, particularly its retained ownership of goodwill. As a result, petitioner contends that calculation of the trademark *576 value solely by reference to license royalties necessarily undervalues the trademark. Petitioner correctly recognizes the close relationship between trademarks and goodwill. Canterbury v. Commissioner, 99 T.C. 223, 252 (1992); see also Stokely USA, Inc. v. Commissioner, 100 T.C. 439, 447 (1993); Philip Morris Inc. v. Commissioner, 96 T.C. 606, 634 (1991), affd. without published opinion 970 F.2d 897 (2d Cir. 1992). The Court of Appeals for the Second Circuit has noted that the naked trademark "has no independent significance apart from the goodwill that it symbolizes." Marshak v. Green, 746 F.2d 927, 929 (2d Cir. 1984). However, petitioner misuses what it calls "black-letter" trademark law. The cases cited by petitioner stand for the principle that a trademark owner cannot transfer a "naked" trademark, the trademark without its associated goodwill; they do not stand for the principle that trademark-associated goodwill encompasses the entire goodwill of a company. See Visa, U.S.A., Inc. v. Birmingham Trust National Bank, 696 F.2d 1371, 1375 (Fed. Cir. 1982). *577 Courts have characterized goodwill as "the expectancy of continued patronage, for whatever reason", Boe v. Commissioner, 307 F.2d 339, 343 (9th Cir. 1962), affg. 35 T.C. 720 (1961), and stated that goodwill consists of "the sum total of those imponderable qualities which attract the custom of a business". Grace Bros., Inc. v. Commissioner, 173 F.2d 170, 175 (9th Cir. 1949), affg. 10 T.C. 158 (1948). Although trademarks represent goodwill, Stokely USA, Inc. v. Commissioner, 100 T.C. at 447, they do not equal goodwill and are only one straw in the bundle that makes up goodwill. See Philip Morris Inc. v. Commissioner, 96 T.C. at 634 (various factors influence the expectancy of continued patronage). Moreover, petitioner fails to note that the licensee, through the license agreement, pays the licensor for all the goodwill associated with the trademark. See Arthur Murray, Inc. v. Horst, 110 F. Supp. 678, 679 (D. Mass. 1953) ("a naked license without * * * transfer of good-will * * *578 * is invalid because of the public deception likely to follow"). Further, contrary to petitioner's assertion, Reams did not omit the trademark-associated goodwill from the value of the trademarks. In his report, Reams recognized that: Because trademarks and trade names provide an aid to the continued patronage of a company's clientele, their value is intimately linked with an important element of the company's goodwill. To the extent that the particular quality that a trademark or trade name signals to the consumer is unique to the product or company that the brand represents, it may not be possible to separate the trademark or trade name from the product or company, and as such the name has no independent value apart from goodwill. * * *
At trial, Reams testified that, although he did not draw a distinction between the two, his calculation sought to capture trademark value and the goodwill associated with the trademark. His attribution of excess earnings to a product seems to satisfy that need. Petitioner also challenges the royalty rates used by Reams. Petitioner contends that many of the Carnation products were well established and could have generated royalties in *579 excess of 5 percent and also that none of the Carnation trademarks should be assigned a zero royalty. The parties obtained third-party comparable evidence, including over 50 licensing agreements with financial information spanning from 1970 to 1992. Petitioner contends that these third-party agreements demonstrate that Reams was unreasonably conservative with respect to both the lower and upper limits for the royalty rates that he used. Petitioner contends that there are 10 license agreements in the record with royalty rates in excess of 5 percent and that there are no agreements in the record that are royalty-free. Further, petitioner contends that the stipulated third-party licenses represent conservative royalty rates because they generally reflect startup products or market extensions where the royalty rates have to be low in order to induce a licensee to enter the market. Petitioner argues that royalty rates rise as brands become established and that the more established brands command substantial royalties. Petitioner maintains that measuring a brand like Coffee-mate against the standard of line and market extension agreements underestimates the rate that such a strong brand *580 would command. We are not persuaded that the third-party license agreements in the record support royalty rates in excess of 5 percent for any of the Carnation trademarks. Petitioner refers to 10 license agreements that contained royalty rates in excess of 5 percent. These agreements, however, were either post-1985 agreements or agreements that provided more than just trademark rights. At trial, testimony by Camillo Pagano (Pagano), the general manager of NSA, and testimony by Maucher indicated that trademark value increases and the "phenomenon of big brands" occurred after 1985. Thus, we are not persuaded that licensing agreements entered into after 1985 demonstrate that Reams' 5-percent ceiling was unreasonable. Further, even petitioner's expert, Reilly, determined in his report that the high end of the royalty rate range for the Carnation trademarks was 5 percent. We are also not persuaded that Reams' assignment of zero or low royalties for certain of the Carnation commodity-type products was unreasonable. The third-party license agreements indicate that the royalty rates for many commodity-type products are minimal. In general, the agreements that petitioner cites to claim a *581 higher royalty relate to franchise agreements for super premium products and associated technology, specialty products, and character and likeness agreements. We are satisfied that the approach used by Reams is reasonable. Throughout its brief, petitioner has tried to justify a high trademark/trade name value by attributing to that value the value of other intangible assets that contributed to the success of Carnation products. The record indicates that consumers purchased Carnation products for many reasons other than because of a trademark or trade name, including price, effective distribution, and shelf location. Thus, we cannot conclude, as petitioner argues, that the "lion's share" of the goodwill represents trademark value. Moreover, the record indicates that the Carnation trademarks and trade names were not as valuable as petitioner maintains. In 1985, Carnation management recognized that its "push" marketing strategy had resulted in reduced brand awareness at the consumer level. At trial, Maucher recognized that the Carnation strategy had depleted trademark value. Petitioner's lack of success in the United States prior to the Carnation acquisition, despite having the Nestle *582 trade name and trademarks such as Nestle Crunch, refutes petitioner's claim that success depended solely on trade names and trademarks. Based on the admitted results of the "push" marketing strategy and on the record as a whole, we conclude that petitioner has not demonstrated that the Carnation trademarks and trade names are worth more than the value determined by Reams, which in turn is higher than the amount determined in the statutory notice. Accordingly, we hold that the trademarks and trade names in dispute have a value of $ 146,100,000. C. Unpatented Technology
Of the technologies that were valued by petitioner for section 338 purposes, the following remain in dispute: Flash-18, drying/instantizing, pet food coating, mibolerone dog food, and low-pH/hot-fill-and-hold. Respondent submitted the expert report of Dee M. Graham (Graham), in which Graham determined that the aggregate value of the technologies was $ 15,706,720; petitioner's expert, Reilly, determined that the aggregate value of the technologies was $ 111 million. 1. Graham's Analysis
Graham determined that the value of the disputed technologies was as follows: Flash-18 $ 2,909,248
Drying/instantizing
11,265,165
Coating
1,532,307
Mibolerone
0   Low-pH/hot-fill-and-hold
0   $ 15,706,720
*583 Graham concluded that the technologies were essentially worthless because they could not be sold separately from the Carnation plants. Graham stated: I believe that the unpatented technology in Carnation's plants could not have been sold per se by Carnation apart from the plants themselves. From a practical standpoint, Carnation could not have assembled the unpatented technology in order to sell it, even if it could have found a buyer, because it had been accumulated over many years and in some cases was in unrecorded form. I firmly believe that a sophisticated food company like Nestle would never have bought unpatented technology from Carnation because it already knew the technologies in question and could have had its own organization or outside vendors easily duplicate the plants and the technology embodied within them. The only way in which the unpatented technology could or would have been bought, therefore, was as part of the physical plant itself.
Graham opined that, because the above technologies were well understood from expired patents and within the general skill of food plant technologists as of the acquisition date, the Carnation plants could be easily *584 designed, engineered, and constructed by a plant engineering company. As a result, Graham determined that the most appropriate measure of value of these technologies was the cost of engineering services that would have been incurred to duplicate the technologies. To the extent that his valuation is based on the ability of Carnation to sell the technologies apart from its plants, Graham's report is unpersuasive. Cf. Estate of McGill v. Commissioner, T.C. Memo. 1984-292. We do not require proof of separate transferability of an asset in order to conclude that a particular asset has a determinable value. Citizens & Southern Corp. v. Commissioner, 91 T.C. 463, 492-493 (1988), affd. 919 F.2d 1492 (11th Cir. 1990). Respondent cites cases in which the cost of replacement method has been accepted as a method of valuation. The cost method is generally used when other methods of valuation, such as comparable sales or income capitalization, are not applicable due to the uniqueness and nonincome-producing use of the property. Provitola v. Commissioner, T.C. Memo. 1990-523, *585 affd. without published opinion 963 F.2d 385 (11th Cir. 1992); see also First Wisconsin Bankshares Corp. v. United States, 369 F. Supp. 1034 (E.D. Wis. 1973) (bank building donated to city valued at cost of reproduction because it was special purpose property and capitalization-of-income method was inapplicable because property was not used for production of income). Here, the technology in dispute was used for the production of various Carnation products and thus was income-producing property. The use to which property is put is relevant to the question of value. 885 Inv. Co. v. Commissioner, 95 T.C. 156, 166-167 (1990). Petitioner maintains that we should reject Graham's analysis because his use of a cost-of-replacement methodology to value the technology does not take into account the uniqueness of the Carnation product formulations and manufacturing processes and, thus, is contrary to Newark Morning Ledger Co. v. United States, 507 U.S.    , 113 S. Ct. 1670 (1993). There, the Supreme Court was persuaded that paid subscribers "had substantial value over and *586 above that of a mere list of customers" and, thus, rejected a method based on the cost of replacement for the valuation of a paid subscriber's list, stating: "The cost of generating a list of new subscribers is irrelevant, for it represents the value of an entirely different asset." Id. at 1682. Under the rationale of Newark Morning Ledger Co., petitioner argues that the cost of replacement as determined by Graham is irrelevant because it does not represent the value of the Carnation "time-tested formulas and technologies". Respondent argues that the circumstances here are distinguishable from those in Newark Morning Ledger Co. because the cost of duplicating Carnation's technology does not represent the value of "an entirely different asset". Respondent cites testimony of independent experts regarding the industry knowledge of the Carnation technology and the availability of alternative and better technologies to support her position that duplicated technology would not be a different asset from existing Carnation technology. The record here contains voluminous testimony and other evidence regarding the specific technologies applied by *587 Carnation and other food companies. The evidence indicates that the industry had a general knowledge of the type of technology used by Carnation but that many aspects of the disputed technology were unique with respect to its application in, and modification for, the manufacturing process of Carnation products. We are satisfied that, to some extent, the application and formulation of the Carnation technologies contributed to the sale of Carnation products at Carnation brand-level prices. Thus, with the exception of the low-pH/hot-fill-and-hold technology, which is discussed below, we are not satisfied that the cost of replicating the technology that was generally known by the trade represents the value of the Carnation technology, because we are not satisfied that the general technology would produce "Carnation" products. See Newark Morning Ledger Co. v. United States, 113 S. Ct. at 1682. 2. Reilly's Analysis
Petitioner's expert, Reilly, determined that, with the exception of the low-pH/hot-fill-and-hold technology, the technologies at issue should be valued by reference to the expected income that a similarly situated food manufacturer could have *588 earned if given access to the technologies. Reilly determined that the value of the low-pH/hot-fill-and-hold technology, based on the cost of replacement, was $ 600,000. Reilly based his factual assumptions on representations made by Carnation management; he did not conduct an investigation of independent companies. Reilly determined that a discrete economic income stream could be directly associated with the products that were produced using the technology, and thus he calculated the value of the disputed technology based on the present value of the net cash-flow attributable to the products that related to the technology (discounted net cash-flow approach) as follows: Flash-18
$ 46,400,000
Drying/instantizing
32,700,000
Coating
18,800,000
Mibolerone dog food
12,600,000
In an effort to value only the component of the income attributable to the technology, Reilly subtracted certain amounts from the income streams generated by the products, including a return on working capital; a capital charge on the identified real and personal property assets used in the production of the income associated with the products; a capital charge on identified intangible assets used in *589 the production of income associated with the products; and a cost for achieving sales volume without the benefit of the Carnation trademarks, trade names, and shelf space. Reilly used a discount rate of 17 percent for Flash-18, drying/instantizing, and coating and used a discount rate of 40 percent for mibolerone to reflect the speculative nature of that technology. Reilly's discounted net cash-flow approach is similar to the "income approach" used by the taxpayer in Newark Morning Ledger Co. v. United States, supra.There, the taxpayer determined the FMV of "paid subscribers" by computing the present value of the after-tax subscription revenues adjusted for costs of collection and depreciation. After rejecting the Government's cost-of-replacement approach, the Supreme Court accepted the taxpayer's valuation under the income approach because "the Government failed to offer any evidence to challenge the accuracy" of the taxpayer's application of that method and because the District Court had held that the value computed under that method represented a willing buyer/willing seller price. Id. at 1682- 1683. Here, in *590 contrast, respondent makes several challenges to Reilly's application of the discounted net cash-flow approach. Respondent argues that Reilly, who was an appraiser and economist but not a food technologist, lacked food technology experience and specific knowledge, independent of the representations of Carnation management, as to the key attributes of each technology. Respondent contends that Reilly's failure to consider industry knowledge of the Carnation technology resulted in a substantially overstated valuation. Respondent further contends that Reilly's calculation does not properly separate his trademark and technology valuations, thus creating the probability that he overvalued one or the other or both. Although we are persuaded that the Carnation technology was unique in some respects, we agree with respondent that Reilly's report exaggerates the uniqueness of the Carnation technology. Reilly relied only on Carnation management for information relating to the technology; Reilly testified that, in his interviews with Carnation management, he was not made aware of "state of the art" technologies that were available as of January 1985. Although Reilly subtracted costs from the *591 income streams in order to prevent an inclusion in technology value for amounts that relate to other intangibles, we are not satisfied that his calculations take into account the proper value of the related intangibles, especially going concern value. Reilly's explanation of his calculations does not indicate that he made any attempt to separate the amount of income attributable to going concern value from the income attributable to the technology. His report indicates that the only intangible asset considered was the Carnation assembled work force. Further, we are not satisfied that Reilly's calculations take into account the differences in product lines that underlie each technology. For example, in computing the cost reductions for advertising and deal expenses, Reilly estimated a certain percentage for each technology for the first 3 years and then, across the board, reduced each by one-half for the subsequent years. Petitioner offers no support of Reilly's cost reductions, other than a mere statement that Reilly subtracted a capital charge for any related intangible. With respect to the Flash-18, drying/instantizing, and coating technologies, the parties have not offered any *592 specific numerical adjustments that would take into account Reilly's exaggeration of uniqueness and his failure to account for the income stream attributable to going concern value. The record indicates that the products that are related to those technologies, such as institutional canned food, Coffee-mate, and Little Friskies, were successful due to many factors unrelated to technology, such as reputation and distribution systems. Estimates of value, particularly those based on assumptions that may or may not accurately predict the future, are inherently imprecise. See Commissioner v. Marshall, 125 F.2d 943, 946 (2d Cir. 1942); Messing v. Commissioner, 48 T.C. 502, 512 (1967). We must do the best we can. Using our best judgment on the entire record and considering relative uniqueness and other factors with respect to each product line, we believe that the technology values calculated by Reilly should be reduced as follows: Reduction
Net Value
Flash-18
40%
$ 27,840,000
Drying/instantizing
30%
22,890,000
Coating
20%
15,040,000
With respect to the mibolerone dog food technology, petitioner submitted revised *593 calculations by Reilly, which calculated value under different discount rates and probabilities in order to reflect a range for the risk of FDA approval for over-the-counter sale. Respondent contends that, by 1982, Carnation and Upjohn knew that mibolerone caused adverse health effects in dogs and that the companies recognized that the chances of over-the-counter approval were "nil". Petitioner contends that Carnation did not view the incomplete letters as unusual because FDA sent five incomplete letters with respect to the approval to sell mibolerone by prescription. Petitioner also argues that the renewal of the joint development agreement with Upjohn in 1985 demonstrates that Carnation remained optimistic for over-the-counter approval. Carnation may have had hope that it would gain FDA over-the-counter approval, but it must have recognized that the likelihood of such approval, as of January 1985, was remote. Reilly's revised calculations, based on a 20-percent probability of cash-flow and a 60-percent discount rate, indicate that the value of the mibolerone dog food was between $ 5,501,000 and $ 6,721,000. We believe that both adjustments are still too optimistic. On this record, *594 we conclude that the mibolerone dog food technology had a value of no more than $ 3 million on January 10, 1985. Reilly used the cost-of-replacement method to calculate the value of the low-pH/hot-fill-and-hold technology, recognizing that the technology was not identified with any unique products. The record indicates that the low-pH/hot-fill-and-hold technology was not only known in the industry but was specified in FDA and State regulations. On this record, we agree with respondent's determination that the low-pH/hot-fill-and-hold technology had no commercial value as of January 10, 1985. D. Goodwill and Going Concern Value
The parties' dispute with respect to the goodwill and going concern value of Carnation involves the selection of the proper method of valuation. The valuation of goodwill and going concern is a question of fact, and the selection of a valuation method must be chosen based upon the particular facts presented. Concord Control, Inc. v. Commissioner, 78 T.C. 742, 744 (1982). There is no single exclusive method for valuing intangible assets; however, case law identifies the bargain, residual, and capitalization methods as the *595 most prevalent means of valuing goodwill and going concern. UFE, Inc. v. Commissioner, 92 T.C. 1314, 1324 (1989); see also Philip Morris Inc. v. Commissioner, 96 T.C. 606, 624 (1991), affd. without published opinion 970 F.2d 897 (2d Cir. 1992). Under the bargain method, the parties' arm's-length bargain is viewed as the appropriate measure of value. 212 Corp. v. Commissioner, 70 T.C. 788, 800 (1978). To use the bargain method, however, the parties must have bargained for the price of each asset in an arm's-length context. Concord Control, Inc. v. Commissioner, supra at 745. Here, neither party has proposed that we apply the bargain method. Under the residual method, the value of cash, cash equivalents, and tangible assets are subtracted from the purchase price, and the remainder constitutes aggregate intangible asset value. Banc One Corp. v. Commissioner, 84 T.C. 476, 502 (1985), affd. without published opinion 815 F.2d 75 (6th Cir. 1987); Jack Daniel Distillery v. United States, 180 Ct. Cl. 308, 379 F.2d 569 (1967). *596 The use of the residual method to value goodwill and going concern is proper where the value of the tangible assets can be ascertained with reasonable certainty. Concord Control, Inc. v. Commissioner, supra at 745-746. In contrast, the capitalization method compares the earning potential of the tangible assets to that of an industry average; to the extent that the purchased assets generate greater earnings than the industry average, the difference is considered goodwill or going concern value. Id. at 746-747. Generally, we prefer the residual method as the best way of "obtaining a more accurate valuation of the acquired intangibles without making speculative assumptions and engaging in unnecessarily complex computations". Banc One Corp. v Commissioner, supra at 506. However, we do not always have the luxury of using the residual method of valuation. See Concord Control, Inc. v. Commissioner, supra (residual method not utilized when value of tangible assets not reasonably ascertainable); Philip Morris Inc. v. Commissioner, supra at 625, 632 *597 (evidence that price paid for the stock does not adequately reflect the value of the underlying assets). The Court of Appeals for the Third Circuit has stated: the theoretical underpinning of the residual value method is that the total price paid for the stock equals the sum of the fair market values of all of the underlying assets. Although this is a sound principle in economic theory, in reality it has its shortcomings. Specifically, it fails to take into account the common situation when one party to the transaction achieves a bargain. If the purchaser of the stock obtains a "good deal," then the residual value method would undervalue the goodwill. If, on the other hand, the price paid is too high, then the computation will result in a correspondingly inflated goodwill figure. This problem does not require rejection of the residual value method--price paid is strongly probative, albeit not conclusive, of fair market value. However, it does suggest that the court consider evidence which would require alterations in the figure or abandonment of the formula altogether. [R.M. Smith, Inc. v. Commissioner, 591 F.2d 248, 252-253 (3d Cir. 1979), *598 affg. 69 T.C. 317 (1977).]
Here, respondent contends that the residual method should be used to determine Carnation goodwill and going concern value because the $ 83-per-share purchase price resulted from an arm's-length bargain and represents the FMV of the underlying assets. Petitioner, on the other hand, contends that use of the residual method is inappropriate here because the price that petitioner paid for the Carnation stock exceeded the FMV of the underlying Carnation assets. Petitioner lists several factors that it contends demonstrates that the price paid for the Carnation stock does not represent the FMV of the underlying Carnation assets: (1) Its absence of due diligence concerning the value of the assets of Carnation at the time of the tender offer; (2) overriding strategic reasons that made the transaction worthwhile for petitioner without reference to the FMV; (3) the existence of a control premium; and (4) the existence of a further premium due to a run-up in stock price caused by insider trading. As a result, we must determine whether the $ 83-per-share purchase price represents the FMV of the Carnation assets. 1. Arm's-Length Bargain *599 and Adequate Information
FMV is defined as the price at which property would change hands between a willing buyer and a willing seller, neither being under a compulsion to buy or sell and both with reasonable knowledge of the relevant facts. United States v. Cartwright, 411 U.S. 546 (1973). The best evidence of FMV is an arm's-length sale between unrelated parties. Banc One Corp. v. Commissioner, 84 T.C. at 502. Petitioner challenges the integrity of the purchase price here, because, according to petitioner, that price was based on the market price of Carnation stock, not on the value of the underlying Carnation assets. Petitioner contends that it did not conduct due diligence concerning the value of the Carnation assets at the time of the tender offer and that it had no information regarding the FMV of the underlying assets of Carnation. Petitioner cites Philip Morris Inc. v. Commissioner, 96 T.C. at 627, where we stated: In those cases where the Court accepted the price-value equivalence assumption in a stock acquisition transaction, the purchaser's objective was to acquire the target *600 company's assets, and both the purchaser and the seller valued such assets (or relied upon the determinations of others) in negotiating the purchase price of the stock. See Jack Daniel Distillery v. United States, 379 F.2d at 579. Indeed, where courts have applied the residual method, the record contained sufficient facts to permit the court to conclude that: (1) The parties to the transfer were specifically bargaining for the value of the target's business, and (2) the purchaser had sufficient knowledge of such business and its operations, including, for example, preacquisition appraisals of the business or its principal assets, to permit it to engage in reasonably informed negotiations as to the business' value. * * *
Although the purchase price here was affected by the Carnation stock trading price, the evidence demonstrates that, in the final analysis, the $ 83-per-share purchase price was reflective of petitioner's view of the underlying earning power, and thus value, of the Carnation assets. At trial, Maucher testified that the Nestle determination of what Carnation was worth was not based on the stock market price but that *601 the stock market price was "a fact I had to accept and had to find out if it was still all right for me to buy it". Prior to formal price negotiations, NSA prepared several financial analyses of Carnation, one of which concluded that the earning power of Carnation, when combined with synergistic effects, could justify a $ 90-per-share purchase price. Statements made at a September 3, 1984, board meeting indicated that the directors determined that, although the $ 83-per-share price was high, it was "fully justified" based on the future prospects of Carnation. At trial, Maucher testified that "we would have liked to pay less, but we knew it was worthwhile to pay this price." A report prepared by Bignami stated that acquisitions in the food industry had historically been completed at 15 times the earnings, which, in the case of Carnation, would make the acquisition price $ 90 per share. Bignami reported that the $ 83-per-share price was "the right price" because $ 83 per share was 13.7 times the 1984 Carnation earnings. The absence of specific asset appraisals is not significant here where petitioner was acquiring an operating business and valued the business, as a whole, in terms of *602 profit potential. See Banc One Corp. v. Commissioner, 84 T.C. at 495. Maucher testified that he saw little value in asset appraisals, calling them "not important for my judgment". In explaining why he did not rely on asset appraisals, Maucher further testified: I looked at the whole business. We saw the profitability of the business now. We calculated our synergies outside of the United States. We considered some of the technological values they had in pet food, in Coffee-mate, and a few things. And the main thing was we considered the value of these plants because we knew this is something if you would have to build it up on our own it would take, I don't know, 30 or 50 years because it takes time.
The circumstances here are distinguishable from those in Philip Morris Inc. v. Commissioner, supra, which involved the selection of an appropriate method for valuing the intangible assets of Seven-Up. There, Philip Morris, a large manufacturer of tobacco products, desired to diversify into the soft drink business. To this end, it acquired all of the outstanding stock of Seven-Up in a hostile takeover. Under the *603 circumstances there, we held that the use of the residual method was inappropriate. Quoting Banc One Corp. v. Commissioner, 84 T.C. at 502, we first noted that the best evidence of FMV is an arm's-length sale between unrelated parties and concluded that the purchase of Seven-Up was not based on an arm's-length agreement negotiated with adequate information. The Philip Morris takeover was hostile, and its pricing strategy was not based on negotiations with Seven-Up or the value of Seven-Up assets or profits but was based on the expected pressure that a substantial premium over the market price would place on the Seven-Up board of directors to respond favorable to the hostile tender offer. Moreover, Philip Morris was "an overanxious purchaser" with inadequate information regarding the financial situation and operations of Seven-Up. Philip Morris Inc. v. Commissioner, 96 T.C. at 627. We contrasted the situation there with that in Banc One Corp. v. Commissioner, supra, where the acquirer and target were engaged in the same business, the acquirer was well aware of the target's business, the *604 acquirer's officers held negotiations with the stockholders of the target, and the acquirer conducted preclosing investigations. Here, the circumstances are more similar to those in Banc One Corp. The $ 83-per-share acquisition price was the result of extensive arm's-length negotiations. At trial, Biggar described the August 30, 1984, negotiations as "a very hard bargaining session" between "two steely-eyed negotiators". Additionally, petitioner had sufficient knowledge of Carnation and was a willing buyer informed as to the relevant facts. Petitioner was a U.S. competitor of Carnation and, as a result, Nestle had information pertaining to the operations and products of Carnation. Cf. Philip Morris Inc. v. Commissioner, 96 T.C. at 627. Further, Carnation made available information as requested by Nestle. Petitioner argues that the nonpublic information provided to Nestle was minimal, that Kvamme spent less than 1 hour discussing this nonpublic information with Nestle representatives, and that the entire transaction was "worked out over a period of weeks". However, Maucher testified that, because of the magnitude of the transaction, Nestle considered *605 the Carnation acquisition very carefully; Angst and Maucher both testified that petitioner had adequate information to assess Carnation and make a reasoned business decision. Petitioner contends that its strategic needs and objectives affected the price that petitioner was willing to pay and that such unique motivations caused it to pay a premium for Carnation. Petitioner contends that Nestle was motivated to increase its market share in the United States and that Carnation offered it the ability to achieve this goal quickly and at a lower cost than by the expansion of its own operations. Petitioner claims that "Unique motivations like Nestle's strategic goals are flatly inconsistent with the FMV definition's requirement of a willing buyer and seller, neither under any compulsion to transact." Petitioner cites the familiar rule that the fair market standard is objective and is not based on the characteristics of a particular buyer or seller. Additionally, petitioner claims that, in Philip Morris, we recognized that an unusually motivated buyer was likely to negotiate a purchase price that did not reflect the FMV of the assets of the target. In Philip Morris, we did not hold *606 that a buyer with unique motivations could not negotiate a purchase price that reflected FMV; rather, we determined that, under the circumstances there of an "overanxious" purchaser that engaged in a hostile takeover, the purchase price of the Seven-Up stock was not the result of an arm's-length negotiation conducted with adequate information. Here, although Nestle had a strong desire to improve its market position in the United States, it was not an "overanxious" purchaser. As of January 1984, it was not interested in Carnation. As of March 1984, Angst was not enthusiastic about Carnation. Nestle later decided to purchase Carnation; however, the record indicates that, if the price became too high, it would have abandoned its effort to acquire Carnation. Angst testified that he would not have increased the offer to $ 85 per share because he thought that price was too high, and he further testified that he thought that the $ 90-per-share price was outrageous. The evidence suggests that Carnation and the Stuart family were much more anxious to close the deal than was Nestle. We rejected an argument similar to petitioner's argument in Solitron Devices, Inc. v. Commissioner, 80 T.C. 1 (1983), *607 affd. without published opinion 744 F.2d 95 (11th Cir. 1984). There, the taxpayer was engaged in the manufacture of semiconductor devices but desired to enter the microwave field. The taxpayer believed that there would be rapid movement by other companies into that area and thus it appeared necessary for it to gain an immediate presence in the microwave field. To that end, the taxpayer commenced negotiations for the acquisition of General RF Fittings, Inc. (GRFF). GRFF was attractive to the taxpayer because its acquisition would provide an immediate competitive advantage and an addition to the taxpayer's product line. Although the negotiations there were abbreviated and the taxpayer offered little resistance to the seller's "firm stance" on price, we concluded that the resulting price was the "best evidence of fair market value". Id. at 21. As we said in Florida Publishing Co. v. Commissioner, 64 T.C. 269, 280 (1975), affd. without published opinion 552 F.2d 367 (5th Cir. 1977): "Different purchasers see different benefits in making acquisitions and such benefits do *608 not necessarily give rise to calling a portion of the acquisition cost a 'premium.'" We conclude that the $ 83-per-share purchase price was the result of an arm's-length negotiation based on adequate information and is the best evidence of the FMV of Carnation. 2. Control Premium
Petitioner also argues that it paid a premium over the market value to acquire all of the Carnation stock. Petitioner contends that, on the trading day immediately before the tender offer announcement, Carnation stock closed at $ 75.50 per share and thus that the $ 83-per-share price represented, at least, a 9.9-percent premium. Citing Philip Morris Inc. v. Commissioner, supra, petitioner contends that the mere existence of a control premium nullifies the price-value equivalence and thus precludes use of the residual method. Respondent does not dispute that petitioner paid a control premium to acquire the Carnation stock but contends that Philip Morris does not preclude use of the residual method here. In Philip Morris, the taxpayer argued that it paid a control premium to acquire control of Seven-Up, that the FMV of the assets of Seven-Up was worth less than *609 the amount that the taxpayer paid for its stock, and, thus, that the residual method was inappropriate. After we concluded that there was a lack of an arm's-length agreement based on adequate information, as discussed above, we evaluated the significance of the control premium that was paid to induce the Seven-Up shareholders to transfer their control of the corporation to Philip Morris. We concluded that a substantial part of the purchase price that was paid for the Seven-Up stock constituted a control premium and thus that the purchase price that was paid for the Seven-Up stock did not accurately and fairly reflect the value of the business. We relied heavily on expert testimony relating to merger and acquisition activities in the context of hostile takeovers, which opined that the control premium paid by Philip Morris represented a payment to the Seven-Up shareholders "to induce them to part with their collective voting power", Philip Morris Inc. v. Commissioner, 96 T.C. at 630, which was separate from the market's evaluation of expected cash-flows from the stock and thus was separate from the market's assessment of the underlying value of the corporate *610 assets. Here, we have found that Nestle had adequate information and that Nestle and Carnation engaged in an arm's-length negotiation; such factors make the circumstances here materially distinguishable from Philip Morris. Moreover, the experts here presented a broader viewpoint of what the control premium in the Carnation acquisition represented than the experts presented in Philip Morris. Respondent submitted the expert report of Karen W. Brown (Brown), in which Brown stated: Although control premiums may be required to induce selling shareholders to pass control, other rationale is necessary in order for it to be a sound economic investment for the acquiror. Control premiums represent the expected additional value to the acquiror which, when realized, will still allow for at least an adequate return on the acquiror's investment. Benefits of control might include the ability to influence and direct business operations and control the allocation of assets and all available resources; select management; set dividend policy; merge or consolidate the operations of the company within another company, including selecting the buyer and negotiating all terms; optimize the *611 firm's capital structure; or liquidate the assets of the company. The extent to which a holder of the majority block of stock has the ability and means to maximize the value of the stock through any of these means will determine the level of control premium paid for the purchase of such block. The premiums attributable to the stock of one corporation versus another will vary depending on certain other factors as well. Typically, the premium will be higher where the buyer is significantly able to increase the future operating cash flows of the company. * * *
Further, petitioner's expert, Reilly, seems to reject the notion that a control premium represents a payment over and above the value of the underlying assets of a corporation. In his report, Reilly stated: "The valuation of a controlling interest in the shares of a company is part of the overall assessment of the value of the entire business". The record here corroborates Brown's description of control premiums. Petitioner and NSA evaluated the purchase price by reference to whether a particular per share price could be justified based on the profits of Carnation and the effects of expected synergy. The studies prepared *612 by NSA prior to formal price negotiations, as well as minutes from the NSA board of directors meeting, indicate that NSA based its decision to proceed with the acquisition of Carnation at $ 83 per share because it determined that the underlying earning power of the Carnation assets would yield sufficient returns. The record supports the conclusion of the board of directors that the control premium inherent in the $ 83-per-share price was reasonable and reflective of the FMV of Carnation. A note sent to Angst stated that the average control premium paid in food acquisitions was about 50 percent. In assessing whether petitioner's $ 83-per-share offer price was reasonable and reflective of the FMV of Carnation, Brown conducted an analysis of six merger and acquisition transactions of comparative companies in the food and food processing industries. Brown derived the control premiums paid in those transactions and reported that the control premiums ranged from 30 percent to 94 percent, with a median of 49 percent; Brown calculated petitioner's control premium as 36 percent. Under the circumstances here, the presence of a control premium does not negate the price-value equivalence and *613 thus does not, itself, preclude the use of the residual method. 3. Insider-Trading Premium
Petitioner also contends that, unbeknownst to petitioner at the time of acquisition, petitioner paid an abnormal premium to acquire Carnation. Petitioner contends that this abnormal premium was caused by the Boesky insider trading of Carnation stock and that the payment of this premium negates the price-value equivalence assumption of the residual method. Specifically, petitioner contends that the Boesky trading caused the Carnation stock price to rise, which in turn caused the acquisition price to increase because the purchase price was equal to the stock price plus a control premium. According to petitioner, the result was an abnormally high premium paid by petitioner for the stock of Carnation that resulted solely from the existence of insider trading, and not because of any fundamental facts or circumstances relating to the value of the underlying assets of Carnation. Petitioner submitted the expert report of John J. McConnell (McConnell). In his report, McConnell reported that, during the 3-month period between June 5 and August 31, 1984, the Carnation stock price experienced a run-up *614 of $ 15.75 per share ($ 59.75 to $ 75.50), for an increase of 26 percent, as compared with an increase of 8.5 percent in the S&P 500 Index over the same time period. In his report, McConnell analyzed the movement of the Carnation stock price over this 3-month period and reported that there was a statistically significant correlation between the movements in the Carnation stock price and the purchases of Carnation stock by Boesky-controlled entities. McConnell opined that much of the "run-up" in the Carnation stock price over the period June 5 through August 31, 1984, was attributable to purchases of Carnation stock by Boesky-controlled entities. Specifically, McConnell opined that, in the absence of Boesky-controlled purchases, the Carnation stock price on August 31, 1984, would have been in the range of $ 61.88 to $ 64.73 per share. Respondent contends that there is not sufficient evidence to establish that the Boesky trading affected the Carnation stock price. Respondent submitted the expert report of Gregg A. Jarrell (Jarrell). Jarrell opined that the Boesky trading did not significantly affect the run-up in the Carnation stock price during the period from early June through August *615 31, 1984. Jarrell concluded that extensive speculation in the national press accounted for the run-up, and that the run-up would most likely have been present to the same degree even if Boesky had not traded in Carnation stock. Jarrell's report stated the following empirical findings that served as the basis for his opinion: Carnation's stock-price runup is not above average, compared with 426 U.S. targets of friendly cash tender offers executed between 1975-1991. Carnation's net-of-market runup during May 25-August 31, 1984 is 25%, compared with 35% for the 426-firm average. The premium for control that Nestle paid for Carnation was not above average. The $ 83 cash price represents a 39% premium over the June 5 closing price and a 54% premium over the May 31 closing price. By comparison, over an exhaustive sample of 144 any-or-all cash tender offers for U.S. targets during 1981-84, the average premium computed on a similar basis is 56.6%. Boesky accumulated about 1.7 million Carnation shares during May 25-August 31, 1984. This represents about 10% of the 16.5 million shares traded in total over this period, and about 4.9% of total outstanding shares of Carnation. Boesky *616 often bought on or around days when public news regarding takeover speculation was released in the marketplace. These news releases caused significant runup, giving the appearance that Boesky's trades caused the runup. Statistical analyses show that takeover speculation in the form of street rumors and news reporting these rumors caused the runup in Carnation's stock price. Boesky's buying had no statistically significant, independent effect on Carnation's runup, after accounting for these takeover speculation news releases.
McConnell and Jarrell each submitted rebuttal reports in which each expert criticized certain aspects of, or assumptions in, the other expert's analysis. An important difference between the two experts relates to the appropriate treatment in the various statistical analyses of rumors and news reporting during the run-up period. Their different analyses and assumptions, we believe, demonstrate the difficulty of segregating the cause of a stock price increase in a market setting and lead us to conclude that such reports are merely speculative. The record here indicates that there were various rumors and stories disseminated into the market relating to a potential *617 acquisition of Carnation. We are not satisfied that petitioner has demonstrated that the Boesky trading was responsible for the run-up in the price of Carnation stock. Petitioner further contends: it gains Respondent nothing to assert, as did Dr. Jarrell, that the run-up was really due to "takeover speculation." Although it is sufficient for the run-up and increased purchase price to have been caused by Boesky-controlled trades, it is not necessary for those trades to have been the exclusive cause of the run-up for the price-value equivalence to fail. Takeover speculation from whatever source derived, can produce the same results as insider trading.
Petitioner also cites language from the House Energy and Commerce Committee report accompanying the Insider Trading and Securities Fraud Enforcement Act of 1988, Pub. L. 100-704, 102 Stat. 4677, to argue that the Committee concluded that, in insider-trading cases, the acquirer is a "victim" of the insider-trader's "misappropriation" and that the purchaser of a publicly traded corporation could be forced to overpay for the stock of the target. Petitioner contends that nonrecognition of this premium is "directly counter *618 to Congress' clearly articulated findings and policies in this area". Petitioner's insider-trading arguments are not persuasive. The stock market price affected the acquisition price in that, because the acquisition was a stock acquisition, any increase in stock price would necessarily cause an increase in purchase price. Nevertheless, petitioner and NSA did not base their assessment of value of Carnation upon the stock market price; rather, petitioner and NSA performed several analyses to determine whether, at a given per share price, the acquisition of Carnation would produce sufficient returns. Petitioner suspected that rumors and leaks had caused a rise in the stock price of Carnation and expressed concern that additional leaks might cause further increases that could jeopardize the acquisition. This indicates that, at some point, the increase in the market price of Carnation stock, caused by whatever source, would have caused petitioner to conclude that the market price exceeded the value of the underlying assets. Petitioner carefully considered the $ 83-per-share acquisition price and concluded that such a price represented a fair price. We cannot conclude that the Boesky trading *619 caused petitioner to pay a premium over the FMV. In sum, we conclude that the circumstances here present an appropriate situation in which to use the residual method to value goodwill and going concern value. The values of the other assets have been either stipulated or determined above, and the $ 83-per-share purchase price represents the value of the business as a whole. See UFE, Inc. v. Commissioner, 92 T.C. 1314, 1324 (1989); R.M. Smith Inc. v. Commissioner, T.C. Memo. 1977-23. Cf. Concord Control, Inc. v. Commissioner, 78 T.C. 742, 745-746 (1982). The residual method is the best method here because of the overlap of other values based on attempts to attribute portions of the total earnings stream to one or another intangible assets, such as trademarks or unpatented technology. Notwithstanding the theoretical possibility of separately valuing goodwill and going concern, we are not satisfied that the evidence in this case is reliable in that regard. Consequently, we hold that the value of the Carnation goodwill and going concern is the difference between the purchase price and the value *620 of the other identified assets of Carnation. IV. The Carnation Sale of Technology and Trademarks
Respondent contends that, under section 1001, Carnation realized a short-term capital gain on the sale of its technology and trademarks to NSA in the amount of the difference between the amount realized, $ 425,630,700, and the adjusted basis of such assets as redetermined. Petitioner does not dispute the nature of the gain but contends that, as a matter of law, Carnation could not have realized a capital gain on the sale because a sale between related parties for more or less than FMV does not produce gain or loss. Citing several cases, petitioner argues that, if a related party pays more or less than FMV for an asset, the excess or shortfall is unrelated to the asset purchase and is attributable to the parties' relationship and must be reclassified accordingly. Jordan v. Commissioner, 60 T.C. 872, 881 (1973), affd. 514 F.2d 1209 (8th Cir. 1975); Investors Diversified Servs., Inc. v. Commissioner, 39 T.C. 294, 308 (1962), affd. 325 F.2d 341 (8th Cir. 1963); New Hampshire Fire Ins. Co. v. Commissioner, 2 T.C. 708, 724 (1943), *621 affd. 146 F.2d 697 (1st Cir. 1945); Pennsylvania Indem. Co. v. Commissioner, 30 B.T.A. 413, 415-417 (1934), affd. 77 F.2d 92 (3d Cir. 1935). Respondent contends that these recharacterization cases are not germane to this sale, a cross-border transaction, and maintains that, under Commissioner v. National Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 149 (1974), and Estate of Durkin v. Commissioner, 99 T.C. 561, 574 (1992), petitioner cannot disavow the form of its transaction, a sale. Respondent argues that allowing petitioner to change the form of its transaction from a sale to part sale and part capital contribution would unjustly enrich petitioner; respondent contends that NSA received the benefit of amortization of the full purchase price against its income in Switzerland and, thus, after obtaining the benefits from that purchase price, cannot now urge the Court to recharacterize the transaction. Citing the following language from Coleman v. Commissioner, 87 T.C. 178, 203 (1986), affd. without published *622 opinion 833 F.2d 303 (3d Cir. 1987), respondent contends that cross-border transactions, like the sale at issue here, require strict adherence to the agreement as constructed by the transactional participants: there is nothing in either Frank Lyon [v. United States, 435 U.S. 561 (1978)] or Thomas [Estate of Thomas v. Commissioner, 84 T.C. 412 (1985)] which compels us to ignore the form of a transaction structured to obtain tax benefits in one jurisdiction and to restructure the transaction, at the insistence of the taxpayer, in order to confer tax benefits in another jurisdiction--in short, to enable the taxpayer to play both ends against the middle. * * *
In response, petitioner contends that it is not trying to disavow the form of its transaction; petitioner defends the form and the substance of its transaction that was structured as a sale of the intangibles for their appraised FMV of $ 425,630,700. Petitioner maintains that, because the sales price of $ 425,630,700 exceeded the recomputed adjusted basis, the tax consequences must be whatever the law dictates, which, according to petitioner, *623 is that the excess purchase price will not be treated as relating to the sale or exchange and will be recharacterized according to the relationship between the parties. Petitioner argues that, if NSA were a U.S. entity, respondent would not claim that an excessive purchase price gave rise to a capital gain because that would have entitled NSA to an increased basis in the assets with potentially beneficial results to NSA. See Pennsylvania Indem. Co. v. Commissioner, supra at 414 (purchasing related-party asset at excessive price and then reselling it to create loss). Petitioner attempts to show that respondent's position in this case differs from that taken in other situations. Petitioner contends that, under section 1.1012-2, Proposed Income Tax Regs., 51 Fed. Reg. 12022 (Apr. 8, 1986), and various revenue rulings and private letter rulings, if a shareholder pays a corporation more than FMV for an asset, respondent bifurcates the transaction into a sale at FMV and a nontaxable capital contribution in the amount of the excess over FMV. These materials are not authoritative and involve factually distinguishable circumstances. *624 In any event, respondent does not in all circumstances contend that sales prices that are greater than arm's-length negotiated amounts constitute a contribution to capital. See Altama Delta Corp. v. Commissioner, 104 T.C. 424 (1995) (excessive transfer price constitutes loan). The cases relied on by petitioner also involve facts distinguishable from those here. New Hampshire Fire Ins. Co. v. Commissioner, supra, and Pennsylvania Indem. Co. v. Commissioner, supra, involved situations where one related party purchases an asset from another related party at a price in excess of FMV out of a desire to aid the other related party. In Pennsylvania Indem. Co. v. Commissioner, 77 F.2d 92 (3d Cir. 1935), the Court of Appeals for the Third Circuit described the situation as "the old story of a father making good the loss of his son's business and starting him again with an unimpaired capital." Accordingly, in those circumstances, it has been held that the amounts in excess of FMV were paid for purposes other than the acquisition of the property itself. See also Jenkins v. Bitgood, 101 F.2d 17 (2d Cir. 1939) *625 (directors of bank purchased bonds at cost, which was substantially in excess of FMV, in order to keep the bank open); Investors Diversified Servs., Inc. v. Commissioner, supra (sales price set based on relationship, not taking into account actual FMV, and attempt to shift income to subsidiary). These cases thus justified an inference that a capital contribution was intended. Here, it was the policy of Nestle to have the intangible assets of acquired corporations transferred to NSA for FMV. Carnation and NSA sought to fix the purchase price at FMV and determined the purchase price of $ 425,630,700 based on the AAA appraisal. The excess purchase price that occurred in this sale was the result of an overvaluation--not because of the relationship between Carnation and NSA. Petitioner's arguments must be evaluated in light of all of the circumstances of petitioner's acquisition of Carnation, and we do not give special weight to the "cross-border" aspects of the transactions. In large part, the sale of the trademarks and technology to NSA was "paid" for by NSA through a cancellation of a portion of the outstanding acquisition debt of petitioner. Divestiture *626 of these and other assets was an important assumption in the determination of how much debt petitioner could incur in the acquisition, and we have held that the funds advanced to petitioner by NSA constituted a bona fide loan, not a capital contribution. To allow the excess purchase price here to be treated as a capital contribution by NSA would, in essence, allow petitioner retroactively to convert debt into equity, without any adverse tax consequences. Cf. Priv. Ltr. Rul. 9215043 (Jan. 14, 1992) (relied on by petitioner for its capital contribution argument but stating that a taxpayer must recognize cancellation of indebtedness income from discharge of indebtedness upon contribution of debt to the capital of taxpayer). In Commissioner v. National Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 149 (1974), the Supreme Court stated: This Court has observed repeatedly that, while a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not, Higgins v. Smith, 308 U.S. 473, 477 (1940); Old Mission Portland Cement Co. v. Helvering, 293 U.S. 289, 293 (1934); *627 Gregory v. Helvering, 293 U.S. 465, 469 (1935), and may not enjoy the benefit of some other route he might have chosen to follow but did not. * * *
The Court of Appeals for the Second Circuit has stated: It would be quite intolerable to pyramid the existing complexities of tax law by a rule that the tax shall be that resulting from the form of transaction taxpayers have chosen or from any other form they might have chosen, whichever is less. [Television Indus., Inc. v. Commissioner, 284 F.2d 322, 325 (2d Cir. 1960), affg. 32 T.C. 1297 (1959).]
Petitioner could have chosen to finance part of its acquisition of Carnation with the capital contribution which it now claims, but petitioner instead chose to structure the acquisition with related-party loans and a sale of assets to NSA. Now that petitioner's determination of FMV of the technology and trademarks has been challenged, petitioner cannot disavow the transactional form that it adopted. See Estate of Durkin v. Commissioner, 99 T.C. at 571-577. Accordingly, we sustain respondent's determination *628 that Carnation realized a short-term capital gain on the sale of its technology and trademarks to NSA in the amount of the difference between the amount realized for those assets and the redetermined basis of those assets. V. Section 6661 Addition to Tax
Section 6661(a) provides for an addition to tax in the amount of 25 percent of any underpayment attributable to a substantial understatement of income tax. For corporations, an understatement is substantial if it exceeds the greater of 10 percent of the correct tax or $ 10,000. Sec. 6661(b)(1)(A) and (B). In general, if a taxpayer has substantial authority for the tax treatment of the item in question, or has adequately disclosed the tax treatment of the item on the return, the taxpayer may escape liability for the addition to tax with respect to that item. Sec. 6661(b)(2)(B)(i) and (ii). Petitioner concedes that there was not adequate disclosure but contends that substantial authority exists for its position with respect to the FMV's of goodwill, inventory, trademarks and technology, and its position on the capital gain issue. Petitioner contends that its positions with respect to the FMV issues were based upon expert opinion, *629 objective evidence, and case law. With respect to the capital gain issue, petitioner contends that there is no basis for the imposition of an addition to tax because there can be no capital gain as a matter of law. In order to demonstrate substantial authority, petitioner has the burden of demonstrating that the substantial weight of the authority supports the position taken on the return. Sec. 1.6661-3(b)(1), Income Tax Regs. Opinions rendered by tax professionals are not authority. Sec. 1.6661-3(b)(2), Income Tax Regs.; see also sec. 1.6662-4(d)(3)(iii), Income Tax Regs. If the authority upon which a taxpayer relies is materially distinguishable from the circumstances here, such authority does not constitute substantial authority. Antonides v. Commissioner, 91 T.C. 686 (1988), affd. 893 F.2d 656 (4th Cir. 1990). Each authority relied on by petitioner is materially distinguishable from the circumstances in this case, as discussed in section IV above. Petitioner also contends that respondent should have granted a waiver of the section 6661 addition to tax, because petitioner acted in good faith and in a reasonable manner. *630 Section 6661(c) authorizes respondent to waive any part of the addition to tax imposed under section 6661 on a showing that (1) there was reasonable cause for the understatement and (2) the taxpayer acted in good faith. The denial of a waiver under section 6661(c) is reviewable by the Court on an abuse-of-discretion basis. Mailman v. Commissioner, 91 T.C. 1079, 1083 (1988). The most important factor in determining reasonable cause and good faith under section 6661(c) is "the extent of the taxpayer's effort to assess the taxpayer's proper tax liability under the law." Sec. 1.6661-6(b), Income Tax Regs.; Mailman v. Commissioner, supra at 1084. Reliance on the advice of professionals, such as appraisers, constitutes a showing of reasonable cause and good faith under section 6661(c) only if, "under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith." Sec. 1.6661-6(b), Income Tax Regs. See Shelton v. Commissioner, 105 T.C.     (Aug. 16, 1995). Petitioner contends that it retained the services of a respected appraiser and filed its return in good faith based on the results of the *631 AAA report. Petitioner argues that, to the extent that there was a substantial understatement, it was attributable to the results provided by an independent appraiser, which petitioner expected to know its business. Petitioner contends that respondent's determination to impose a section 6661 addition to tax, when petitioner filed its return based on the results of the AAA appraisal, is arbitrary, capricious, and without sound basis in fact. Respondent contends that petitioner was the perpetrator of an aggressive valuation by AAA and thus that its reliance on that valuation was not reasonable and in good faith. Respondent relies on documents in the record reflecting that AAA was instructed by PMM to take a "very aggressive" posture on the valuation of intangible assets in anticipation of the sale of such assets to NSA. Although PMM representatives testified and generally denied making any statements to AAA of that nature, there is no credible evidence that a "misunderstanding" explains AAA's records. Nonetheless, petitioner's evidence of good faith reliance on PMM and AAA is not negated by AAA's internal records. Most significantly, the understatements resulting from our factual *632 findings in this case are based on our conclusions of value, which--except for trademarks and trade names--did not agree with either party's position at any stage, i.e., from the time of the return, through the pleadings, during trial, or in the briefs. There is no clear-cut rule as to the correct methodology for valuation of the intangible assets involved here. In the final evaluation, our findings do not support a conclusion that AAA's values on the items in dispute were farther afield than those of other experts, including those employed by respondent. In view of the difficulty and inherent lack of certainty in the valuation process, it is unreasonable to penalize petitioner, either for what its professional advisers perceived to be their objective or for not prevailing in Court. We conclude that respondent did abuse her discretion in denying a waiver in this case. Accordingly, we hold that petitioner is not liable for the section 6661 addition to tax. VI. Summary
In summary, we hold that: (1) Petitioner and Carnation are entitled to interest deductions of $ 131,739,791; (2) the FMV's of Carnation's assets as of January 10, 1985, are as follows: Inventory
$ 462,625,070
Trademarks and trade names
146,100,000
Unpatented technology
68,770,000
Goodwill and going concern
Residual *633 (3) Carnation must recognize capital gain on its sale of assets to NSA; and (4) petitioner is not liable for the section 6661 addition to tax. Decision will be entered under Rule 155.